**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Hilario MENDOZA–SALGADO,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramon Edwardo GARCIA,
Defendant–Appellant.**

**Nos. 90–2283, 90–2286.**

United States Court of Appeals,
Tenth Circuit.

May 15, 1992.

Presiliano Torrez, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., and James D. Tierney, Asst. U.S. Atty., with him, on the brief), Albuquerque, N.M., for plaintiff-appellee.

Salvador C. Ramirez, Anthony, N.M., for defendant-appellant Mendoza–Salgado.

Mary Stillinger (Bernard J. Panetta, II, with her, on the briefs), Caballero, Panetta & Ortega, El Paso, Tex., for defendant-appellant Garcia.

Before LOGAN and BRORBY, Circuit Judges, and CARRIGAN,* District Judge.

BRORBY, Circuit Judge.

A grand jury indicted sixty-three-year-old Defendant Hilario Mendoza–Salgado (Mendoza) on charges he conspired to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846. Co-defendant Ramon Edwardo Garcia was indicted on the conspiracy count as well as charges he distributed more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A), and 18 U.S.C. § 2. Mr. Garcia filed a pretrial motion to suppress evidence seized during a warrantless search of his residence. The United States District Court for the District of New Mexico denied the motion and admitted the evidence at trial. A jury returned guilty verdicts against both defendants on all counts. Defendants allege numerous points of error in this consolidated appeal.

Mr. Mendoza claims the district court rendered his trial fundamentally unfair because it denied him access to a confidential government informer defendant considered essential to his entrapment defense. Mr. Mendoza also contends the government entrapped him as a matter of law because agents induced him to locate a cocaine supplier. Furthermore, he asserts no reasonable jury could reject his entrapment defense since the government failed to prove he was predisposed to commit the conspiracy offense. In the alternative, Mr. Mendoza argues the government produced insufficient evidence to sustain his conspiracy conviction. Finally, Mr. Mendoza claims the district court abused its discretion when it allowed prosecutors to introduce firearms and cocaine seized at Mr. Garcia's residence as evidence against him.

Mr. Garcia contends the district court erred in denying his motion to suppress evidence agents seized during a warrantless entry and search of his home. Mr. Garcia also claims the district court denied his Sixth Amendment right to counsel of choice when it required him to proceed to trial with attorneys whom he met only four days prior to the hearing and whom he did not want representing him. We have jurisdiction under 28 U.S.C. § 1291 and affirm the convictions of both defendants.

## BACKGROUND

Testimony and evidence produced during the pretrial suppression hearing and subsequent trial detail the following course of events. As part of an undercover operation, Drug Enforcement Agent (DEA) Jesus Gallo instructed a confidential informer to spread the word he was a narcotics buyer interested in purchasing cocaine. In early January 1990, the informer notified Agent Gallo that Mr. Mendoza could supply large quantities of the drug. In a telephone conversation with Agent Gallo on January 18, 1990, Mr. Mendoza confirmed he could supply kilogram quantities of cocaine. Although the record is unclear as to who placed the telephone call, Mr. Mendoza indicated he did not want to discuss "business" on the phone and preferred instead to meet in person to pursue the matter further.

During a collect call to Agent Gallo on March 12, 1990, Mr. Mendoza arranged a meeting between the officer and defendant's supply source.[1] Mr. Mendoza insisted that Agent Gallo work through him in

---

* The Honorable Jim R. Carrigan, United States District Judge for the District of Colorado, sitting by designation.

1. Agent Gallo taped the telephone conversation during which both parties conversed in Spanish. Excerpts of the tape transcribed by Agent Gallo appear below:

 [Agent Gallo = JG; Mendoza = HM]
 HM: Listen, everything is ready now.
 JG: Everything is ready?
 HM: Everything, everything. And they'll take it to Las Cruces like the guy told me.
 JG: Uh, huh.

 . . . .

 HM: And ... (unintelligible) ... I told the guy. No, he said we'll give him a sample and everything.

 . . . .

 HM: Look, we're not going to harm you, because of what Saul said. No, no, I told him, you're dealing with reputable people here.
 JG: Yeah.

 . . . .

 HM: That's what I want, to sell the good thing. He does not have the need to ... (unintelligible) ... the people or to deceive them. Do you understand?
 JG: Yeah, sure, sure.

all future transactions, assured the agent no harm would come to him and promised delivery of a sample of cocaine at their meeting.

....

HM: Look, I wasted all day today. The other time, I went to Guadalajara.

JG: Yeah.

HM: And the other guy didn't keep his word and didn't show up. Yesterday I told him not to do me wrong because I need bills and I been up and down.

JG: Yeah, yeah, I understand.

HM: Expenses, a lot of expenses. I told him and it's hard.

....

HM: Okay, I will also tell you one thing. If there is a deal, another time you want to do business, call me first because ... you know.

JG: No, well look ...

HM: One works hard to look for clients and then they want to screw them.

JG: No, no, no, no. I understand that.

....

HM: The guy that going to meet with you, Beto, is not young and is about 35 years old.

JG: Beto?

HM: Yeah, he is not.... I recommend him. He's going to hand it over to you and you hand it over to him.

JG: Oh.

HM: Do you understand me?

JG: Then, Beto is the owner? Just say for now.

HM: Yeah, he's associated with another man.

JG: Okay, then, okay. And you're also going to be there then?

HM: Excuse me?

JG: Are you going to be there?

HM: Yes, yes, sure, I'm going to be there but like I said, there's not going to be any problems with him. There's not going to be any problems here on our behalf.

JG: Uh, huh.

....

HM: Look, yesterday we were going to deliver a load.

JG: Uh, huh.

HM: To some guys that have horses here in Sunland Park.

JG: Uh, huh.

HM: Well, they didn't have enough money and he told me to ... (unintelligible). I lost all day and no, I said that these guys look like they want to do something. If they come, I said you'll have plenty and why worry about dealing with others.

....

HM: Right now there is a lot of mistrust, you know.

JG: That's what I'm saying. That's why I want to talk to you and like that you ...

HM: Look I know a lot of guys that, well they had been buying like that and finally, they hit them bad.

Agent Gallo, along with another individual, met Mr. Mendoza and his supplier, Alberto "Beto" Sierra Salas (Sierra), at a

JG: But that's one thing. I want to talk to you only just that you don't come out showing me a badge or something.

HM: No, no, no sir. I am of man, not because I'm saying it but the Man is there and may the sky fall on me if I lie to you.

JG: Uh, huh.

HM: (unintelligible)

JG: Okay.

HM: If they were to harm you ...

JG: Uh, huh.

HM: I would tell you. Hey, you know what, don't get into that.

JG: Very good.

....

HM: And, more or less what quantities you want. Do you understand? Because I told this guy, Saul said that you wanted plenty.

JG: Yeah, at first we do.

HM: Yeah.

JG: And if it's going to be given to me.

HM: Listen, if you want, they are going to give you the sample.

JG: They're going to give it to me?

HM: Give it ...

JG: Okay.

HM: And I don't think they're going to do anything to you. Just come without any worries.

JG: Okay. I'm telling you that I won't be taking anything I just want to talk to you and the other guy.

HM: Yeah, so you're not going to bring any money or anything like that.

JG: Well, just enough for me but not to do that because like I told you, I have to return to ...

HM: Well, just bring something ... (unintelligible) ... if you don't have to buy a lot just a little something. Just so that we can have enough to get some beans.

JG: Yeah, look, I do need some of the other. I can buy a piece.

HM: Of the dark one?

JG: Yes.

HM: It's that it is very far.

JG: Just one piece, can you?

HM: No, that thing is in Dallas.

JG: In Dallas? And you can't get me some?

HM: Maybe I can.

JG: Just a piece man.

HM: You don't want any soda?

JG: Ah, just give me the sample for now. I don't want to do anything now, I want to get to know you first.

HM: Yeah.

JG: Okay?

HM: Uh, huh.

JG: And if I can get the sample, then we'll take it from there.

HM: No, no. This guy sells good stuff.

restaurant in El Paso the following day.[2] Both Mr. Mendoza and Mr. Sierra openly discussed past drug transactions in front of Agent Gallo, describing an ongoing distribution scheme involving hundreds of kilos of cocaine supplied by an unidentified member of the Mexican Federal Judicial Police. During this meeting, Mr. Sierra and Mr. Mendoza agreed to deliver thirty kilograms of cocaine to Agent Gallo in Las Cruces, New Mexico the following week for a sale price of $570,000. Mr. Sierra promised to pay Mr. Mendoza for his services, and from then on the agents should conduct all business directly with him. Before leaving, Mr. Sierra gave Agent Gallo a sample of cocaine.

A week later, undercover DEA Agents Gallo and Alfredo Ortega met Mr. Sierra at a restaurant in Las Cruces to arrange delivery of the cocaine. At first, Mr. Sierra indicated he could deliver only nine kilograms of cocaine because his source, whom he identified as a man who owned two bars in El Paso, had sold much of the supply since their previous meeting. After the agents displayed $475,000 in cash, however, Mr. Sierra reversed himself and promised delivery of the full thirty kilograms originally agreed upon.

The next day Mr. Sierra again met with Agent Gallo to finalize the delivery terms.[3] They settled on a two-part transaction. First, Mr. Sierra agreed to pick up nine kilograms of cocaine from his source and deliver the load to Agent Gallo at a rest stop just inside the New Mexico state line. In exchange, the agent promised to hand over $171,000 cash. Afterwards, Mr. Sierra planned to retrieve the remaining twenty-one kilograms and complete a second delivery within two hours.

Following the meeting, DEA Special Agent Jimmy Garza and other agents using aircraft surveillance trailed Mr. Sierra to Defendant Garcia's house in El Paso. At approximately 2:20 p.m. Mr. Sierra left Mr. Garcia's residence carrying a fifty pound pet-food bag which he placed in the trunk of his car. Ten minutes later, Mr. Sierra called Agent Gallo on his cellular phone and stated he was en route to the prearranged rest area. Surveillance teams again kept Mr. Sierra under watch during the forty-five minute drive from Mr. Garcia's house to the meeting site. Agents promptly arrested Mr. Sierra after he showed Agent Gallo nine kilograms of cocaine stuffed inside a pet-food bag in his trunk.

At 3:40 p.m. agents decided to secure Mr. Garcia's residence, and either obtain a search warrant or seek consent to search his house for the remaining twenty-one kilograms of cocaine. Agents watched the house, while officers from the DEA, the Texas Department of Public Safety, the El Paso Police Department, and the United States Border Patrol met in a nearby parking lot.

At 5:30 p.m. seven agents, some with guns drawn at their sides, approached Mr. Garcia's residence and knocked on the door. Mr. Garcia's eleven-year-old son appeared in the entrance. The officers identified themselves as drug agents, asked if they could come inside, and walked past the boy after he allegedly motioned them in.[4] The agents found Mr. Garcia and nine

**2.** Mr. Sierra was a third co-defendant in this action but pleaded guilty to both conspiracy and drug distribution charges. He is not a party to this appeal.

**3.** Agent Gallo wore a transmitter during this exchange and taped the conversation. Mr. Sierra explained that Mr. Mendoza offered to accompany him during the delivery but Mr. Sierra declined, believing the agent meant no harm. Nevertheless, Mr. Sierra expressed his potential need for a machine gun because he did not "know who he was dealing with." Although Mr. Sierra assured the agents he expected no problems in the transaction, his comments suggested he still might carry weapons. He told Agent

Gallo: "I guarantee there's no problem. I'll give you the ... gun so you can kill [my] brothers right there."

**4.** The district court made no clear finding whether the agents obtained valid consent to enter the premises. Agents who testified at trial could not agree on the issue. DEA Agent Jimmy Garza testified that officers did not seek a search warrant prior to entering the residence because they needed all their available manpower to secure the house. Agents feared Mr. Garcia would destroy the remaining cocaine when Mr. Sierra failed to return for the second delivery within the prearranged two hours. Agent

others in the house, including his wife, four children, a sister, his ninety-year-old mother, and an unrelated male.

Mr. Garcia admitted joint ownership of the house with his wife, but refused to grant the agents consent to search the premises. He also admitted he owned a bar in El Paso, which agents testified was a frequent hangout for members of the Mexican Federal Judicial Police. Soon thereafter, officers arrested Mr. Garcia under the mistaken belief he was the same individual named in an unrelated arrest warrant police learned of after entering the house. Mr. Garcia insisted he was not the same individual named in the warrant, and a cursory check revealed he did not have the identifying tatoos on his arms as described in the warrant. However, his name, height and general appearance matched the named individual. He also produced two driver's licenses with different addresses which aroused police suspicion. As a result, officers took Mr. Garcia to the El Paso Police Department to verify his identity.

The agents immediately told Mrs. Garcia the reason for her husband's arrest and explained that they suspected cocaine on the premises. Agents indicated they would guard against removal of drug evidence by remaining in the house while other officers completed attempts to obtain a search warrant. Mrs. Garcia, who agents testified appeared "calm, quiet, observing, listening, friendly [and] cooperative," insisted she knew nothing about cocaine and said, "go ahead and search." Mrs. Garcia signed a search consent form after agents read her the terms in Spanish and advised her of the right to withhold consent. Agents insisted Mrs. Garcia understood the signed document. She asked no questions before or during the search, nor did she withdraw consent at any time.

Agents found eleven loaded firearms in the master bedroom, as well as a briefcase containing 700 grams of cocaine. Mrs. Garcia told agents the briefcase belonged

Garza also testified four to twelve hours might pass before officers could procure a warrant in

to her husband and he forbade her to open it.

## DISCUSSION

### I. CONFIDENTIAL INFORMER

■ Defendant Mendoza asserts the district court deprived him of due process and a fair trial by denying his motion to disclose the identity of the DEA's confidential informer. Mr. Mendoza claims the informer was essential to his entrapment defense because he was the only individual capable of testifying as to whether or not defendant was predisposed to commit the offense. We find no constitutional error.

■ Due to the strong public interest in furthering effective law enforcement, the government enjoys a privilege to withhold from disclosure the identity of persons who furnish law enforcement officers with information on criminal acts. *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). While anonymity encourages citizens to communicate their knowledge of unlawful activity, the privilege must give way to fairness when disclosure of the informer's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60–61, 77 S.Ct. at 628. The need for disclosure depends on the "particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. at 629. In short, the problem "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.*

■ We have applied the legal standard established in *Roviaro* on numerous occasions. While we agree the district court must disclose the informer's identity if the individual's testimony "might be relevant to the defendant's case and justice would best be served by disclosure," *Unit-*

the western district of Texas.

ed States v. Reardon, 787 F.2d 512, 517 (10th Cir.1986), we have consistently ruled that where the information sought "would be merely cumulative," or where the informer did not participate in the illegal transaction, disclosure is not required, *United States v. Scafe,* 822 F.2d 928, 933 (10th Cir.1987). *See United States v. Freeman,* 816 F.2d 558, 562 (10th Cir.1987); *Reardon,* 787 F.2d at 517. "[M]ere speculation about the usefulness of an informant's testimony" is not sufficient to warrant disclosure. *Scafe,* 822 F.2d at 933. Nor must the government supply the defendant with information about an informer when the individual introduces suspected traffickers to narcotics agents. *United States v. Ortiz,* 804 F.2d 1161, 1166 (10th Cir.1986). While the district court's order failed to specify the reason for denying Mr. Mendoza's motion for disclosure, the omission is of little consequence. We review de novo all questions of law and mixed questions of law and fact. *Hopkinson v. Shillinger,* 866 F.2d 1185, 1197 (10th Cir.1989).

Mr. Mendoza cites and relies heavily on *Roviaro* in support of his claim that the informer was an essential witness. In *Roviaro,* the Supreme Court set aside a defendant's drug conviction where the government did not identify or produce an informer who "was the sole participant, other than the accused, in the transaction charged." 353 U.S. at 64, 77 S.Ct. at 630. Only the informer was "in a position to amplify or contradict the testimony of government witnesses. Moreover, a government witness testified that [the informer] denied knowing [the accused] or ever having seen him before." *Id.* at 64–65, 77 S.Ct. at 630. Under these circumstances, the Court held that withholding disclosure was prejudicial error because the informer's "possible testimony was highly relevant and might have been helpful to the defense." *Id.* at 63–64, 77 S.Ct. at 629.

Unlike *Roviaro,* the informer here did not actively participate in the transaction which generated the charge. Instead, the record indicates the informer merely spread the word about Agent Gallo's interest in large quantities of cocaine, later informed the DEA that defendant could sup-

ply the drug, and accompanied Agent Gallo during the introductory meeting with defendant's supplier, Mr. Sierra. Nothing in the record suggests the informer participated in the actual sale of cocaine.

■ While Mr. Mendoza claims only the informer knew whether he was induced or predisposed to commit the offense, defendant identifies no specific testimony the witness could contribute to his entrapment defense. Nor do we see any details the informer might provide beyond Mr. Mendoza's own testimony that the informer repeatedly asked him to locate a cocaine supplier. Such testimony would result in needlessly cumulative evidence. Where the value of the informer's testimony remains speculative at best, we cannot say the district court erred by denying disclosure of the informer's identity.

## II. ENTRAPMENT

### A.

Nevertheless, Mr. Mendoza argues the government's repeated attempts to induce him into the drug trade by asking him to locate a cocaine supplier for Agent Gallo entitled him to a judgment of acquittal. Because the district court properly instructed the jury on the entrapment defense, we need not consider whether a triable issue of entrapment exists. Instead, we review only whether the government entrapped Mr. Mendoza as a matter of law.

■ Our review of this issue is narrowly defined. We may find entrapment as a matter of law " 'only when there is undisputed testimony which shows conclusively and unmistakably that an otherwise innocent person was induced to commit the act.' " *United States v. Fadel,* 844 F.2d 1425, 1434 (10th Cir.1988) (quoting *United States v. Gurule,* 522 F.2d 20, 23 (10th Cir.1975), *cert. denied,* 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976)).

■ Sufficient disputed testimony arose at Mr. Mendoza's trial to preclude the district court from finding the government entrapped defendant as a matter of law. For example, Mr. Mendoza and others who

testified on his behalf, insisted the confidential informer badgered defendant into locating a cocaine source. After repeatedly ignoring the requests, Mr. Mendoza finally told Mr. Sierra about the informer's interest in cocaine. Although Mr. Mendoza knew Mr. Sierra dealt in drugs, defendant insisted he took no active role in the drug transactions, claimed he knew nothing about drugs, and swore he had never seen cocaine prior to trial. Instead, Mr. Mendoza maintained Agent Gallo was "slippery" and was only "catching [him] in a net."

Agent Gallo's testimony directly contradicts these claims. Agent Gallo told the jury the informer did nothing to induce Mr. Mendoza into the cocaine market, aside from giving defendant and others interested in selling cocaine the agent's telephone number. Thereafter, Mr. Mendoza volunteered that he could supply kilogram quantities of cocaine and later telephoned Agent Gallo regarding the initial purchase. Defendant inquired whether the officer wanted immediate deliveries of cocaine, promised that his associates would provide a sample of the drug at their first meeting and discussed general delivery terms. Even Mr. Sierra testified defendant knew about the cocaine deal and admitted he planned to pay Mr. Mendoza a few hundred dollars for arranging the transaction.

We need not pursue the inquiry further. Conflicting testimony such as this precludes us from finding defendant was entrapped as a matter of law. *See United States v. Young*, 954 F.2d 614, 616 (10th Cir.1992); *United States v. Dozal–Bencomo*, 952 F.2d 1246, 1249–50 (10th Cir.1991); *United States v. Price*, 945 F.2d 331, 332 (10th Cir.1991). Because the factfinder is traditionally in the better position to evaluate conflicting evidence and determine credibility, the district court did not err in denying Mr. Mendoza's motion for judgment of acquittal. *See Dozal–Bencomo*, 952 F.2d at 1250.

### B.

■ Sufficient evidence also arose for the jury to reject Mr. Mendoza's entrapment defense. Where a jury rejects an entrapment defense, this court will intervene only if no reasonable jury could have disallowed the defense. *See Young*, 954 F.2d at 618.

■ The purpose underlying the entrapment defense is to protect an otherwise unpredisposed individual from government coercion. *Ortiz*, 804 F.2d at 1165. The focal point in entrapment, therefore, centers on the defendant's intent or predisposition to engage in the offense rather than the degree of government involvement. *See Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *Fadel*, 844 F.2d at 1433; *Ortiz*, 804 F.2d at 1165. In other words, we inquire whether the criminal intent originated with the defendant or with the government agents. *Ortiz*, 804 F.2d at 1165. Only when the government deceives the defendant to the extent that it " 'actually implants the criminal design' " in the defendant's mind will entrapment arise. *Hampton*, 425 U.S. at 489, 96 S.Ct. at 1649 (quoting *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973)).

### *Predisposition*

Mr. Mendoza claims the government failed to show he was predisposed to conspire in the cocaine trade, particularly where he possessed no criminal history in drug activity and where he repeatedly resisted the informer's requests to locate a cocaine supplier.

■ In considering whether a defendant is predisposed to specific criminal conduct, we examine his "inclination, willingness or readiness to engage in the illegal activity for which he has been charged." *Dozal–Bencomo*, 952 F.2d at, 1250 (citing *Ortiz*, 804 F.2d at 1165). The inquiry focuses on the defendant's state of mind prior to the time government agents suggest the illegal activity. *Id.* Evidence of a defendant's predisposed character may derive from direct proof the individual previously engaged in the illegal activity, *id.*, or may be inferred from "defendant's desire for profit, his eagerness to participate in the

transaction, his ready response to the government's ... offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *Fadel*, 844 F.2d at 1433. However, once defendant raises the entrapment defense, he "opens himself to a 'searching inquiry.'" *Id.*

Resolving all issues of credibility in favor of the government, a reasonable jury could find Mr. Mendoza was predisposed to participate in the illegal drug trade. First, the evidence indicates Mr. Mendoza desired to profit from the cocaine sale, because he expected "a few hundred dollars" for introducing Mr. Sierra to Agent Gallo. Mr. Mendoza also insisted that Agent Gallo's future drug purchases go through him because "[o]ne works hard to look for clients." He indicated he needed money to cover "a lot of expenses." Furthermore, defendant sought to protect his investment by volunteering to accompany Mr. Sierra when he finally delivered the cocaine to the agents. This evidence suggests a strong desire to consummate and profit from an illegal drug transaction.

Likewise, Mr. Mendoza's solicitous telephone discussions with Agent Gallo regarding defendant's ability to supply cocaine, his express interest in handling future drug purchases and his attendance at the preliminary meeting between Mr. Sierra and agents exemplifies a profound eagerness to engage in the illegal activity. Mr. Mendoza repeatedly described himself as part of an organization that wanted "to sell the good thing." Again, a jury could properly consider this evidence as to Mr. Mendoza's predisposed character to deal in narcotics.

Similarly, Mr. Mendoza's vocabulary and manner of dealing with Agent Gallo evidences more than a passing knowledge of the illicit drug trade and strongly implicates him in the illegal activity. Agent Gallo testified that during his first telephone conversation with defendant, Mr. Mendoza indicated he preferred to meet in person rather than discuss "business" on the phone. Agent Gallo explained those dealing in narcotics seldom discuss transactions over the phone because they fear police may "tap" the lines. Mr. Mendoza's use of "code words" to describe drugs and related matters further exemplifies his understanding of the narcotics trade. For instance, Agent Gallo testified the defendant used the words "hit bad" to describe the arrest of acquaintances caught selling narcotics. Mr. Mendoza also described an ounce of heroin as "a piece," referred to black tar heroin as "the dark one," and called cocaine by its slang name "soda." Despite their mutual distrust of each other in entering a first-time drug transaction, Mr. Mendoza repeatedly assured Agent Gallo's safety. In reference to Agent Gallo's feigned concern that defendants might actually work as undercover police officers, Mr. Mendoza replied, "No, no, no sir .·. and may the sky fall on me if I lie to you." If the business transaction Mr. Mendoza proposed was within the bounds of the law, we believe little need would exist to reassure Agent Gallo of his safety or adamantly deny all ties with law enforcement.

Mr. Mendoza's open references to past unsuccessful attempts to deliver 300 kilograms of cocaine to other buyers, as well as his mention of a 500 kilogram deal proposed for a later date further shadow his claim of innocence. The government need not bring forth definitive proof "the defendant has engaged in prior acts or prior violations of the narcotics laws" to secure a conviction. *Fadel*, 844 F.2d at 1433. Instead, prosecutors need only produce sufficient evidence to convince a jury the defendant was predisposed to engage in the activity. As we noted in *Dozal–Bencomo*, the distinction between a defendant's "vulnerability and predisposition [is] a matter of degree, not kind." 952 F.2d at 1251. The precise juncture at which an otherwise innocent individual "succumbs to an inherent willingness to participate in unlawful behavior" depends upon the specific facts at issue. *Id.* The evidence before us does not portray an innocent individual unwittingly caught up in an illegal drug transaction; instead, it unveils an eager participant.

*Inducement*

Nevertheless, Mr. Mendoza claims the government informer induced him to locate a cocaine supplier for Agent Gallo despite his professed lack of knowledge about illegal drugs.

■ "Inducement" is any " 'government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense.' " *United States v. Sullivan*, 919 F.2d 1403, 1418 (10th Cir.1990) (quoting *Ortiz*, 804 F.2d at 1165). Inducement may arise from " 'persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.' " *Ortiz*, 804 F.2d at 1165 (quoting *United States v. Burkley*, 591 F.2d 903, 913 n. 18 (D.C.Cir. 1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979)).

Therefore, we focus our inquiry on whether the defendant stood eager or reluctant to participate in the alleged criminal conduct. *Id.* We find the evidence clearly exposes Mr. Mendoza as a willing participant in the cocaine transaction, not the gullible alcoholic who earned a living selling scrap iron as he described himself at trial. The record indicates the government informer did no more than advertise Agent Gallo's interest in purchasing cocaine and put Mr. Mendoza in contact with the agent. From that point forward, Mr. Mendoza initiated discussions about selling cocaine, arranged the preliminary introduction between his supplier and agents, and coaxed Agent Gallo to immediately purchase "a little something" so he and his associates could afford "to get some beans." Defendant also attended the meeting at which Mr. Sierra delivered Agent Gallo the promised sample of cocaine.

■ Even if the informer repeatedly urged Mr. Mendoza to find a cocaine supply source for government agents between January and April 1990, as defendant suggests, our decision would stand unchanged. The record clearly shows Mr. Mendoza told Agent Gallo as early as January 18 that he could supply kilogram quantities of cocaine. Evidence tending to show a govern-

ment agent "approached, solicited or requested the defendant 'to engage in criminal conduct, standing alone, is insufficient to constitute inducement.' " *Dozal–Bencomo*, 952 F.2d at 1252 (quoting *Ortiz*, 804 F.2d at 1165); *see also United States v. Jobe*, 487 F.2d 268, 270 (10th Cir.1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). Nor does evidence the government assisted in the unlawful transaction amount to inducement. *Id.* (citing *Fadel*, 844 F.2d at 1433). We simply see no evidence the government improperly brought about Mr. Mendoza's desire to engage in a drug conspiracy.

*Entrapment Summary*

In the final analysis, " 'entrapment is a relatively limited defense.' " *Fadel*, 844 F.2d at 1429 (quoting *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973)). The government need not produce absolute proof of predisposition, but rather, it need only convince a jury beyond a reasonable doubt the criminal intent originated with the defendant. *Ortiz*, 804 F.2d at 1165. A narcotics agent "may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest." *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 147 (1992). Ordinarily, the entrapment defense is of little benefit in such a case "because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Id.* (citing *United States v. Sherman*, 200 F.2d 880, 882 (2d Cir.1952)). We believe the jury heard sufficient evidence to conclude the government did not entrap Mr. Mendoza, and we refuse to disturb its verdict.

## III. SUFFICIENCY OF THE EVIDENCE

■ Although the jury rejected his entrapment defense, Mr. Mendoza asserts the government failed to present sufficient evidence to sustain a conspiracy conviction. The most basic element of a drug distribution conspiracy is an agreement between two or more individuals to violate federal

narcotics laws. To obtain a conviction for conspiracy to distribute cocaine under 21 U.S.C. § 846, "[t]he government must prove by direct or circumstantial evidence that a conspiracy existed, that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily became part of it." *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.1988). "A defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role" in the conspiracy to incur liability. *Id.* An overt act is no longer an essential element of conspiracy under the statute. *Id.* Instead, a factfinder may infer that defendant participated in the scheme solely by his or her actions. *Id.* Although mere presence at the crime scene is insufficient to warrant conviction, it may be "a material and probative factor which the jury may consider." *Id.* Furthermore, when viewed in a light most favorable to the government, we must determine whether the evidence is sufficient for a jury to find the defendant guilty beyond a reasonable doubt on the essential elements of the crime. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). We have reviewed the record thoroughly and find ample evidence to sustain Mr. Mendoza's conspiracy conviction.

First, the record clearly reflects the existence of a conspiracy to distribute cocaine. During telephone conversations with Agent Gallo, Mr. Mendoza stated he could supply kilogram quantities of the drug. The defendant later arranged a meeting between Agent Gallo, co-defendant Sierra and himself to discuss purchase terms. He named Mr. Sierra as "the owner," but indicated Mr. Sierra's activities involved another man. During Agent Gallo's first rendezvous with Mr. Mendoza and Mr. Sierra, both defendants boasted their distribution scheme involved hundreds of kilograms of cocaine supplied by an unidentified member of the Federal Mexican Judicial Police. After agreeing to an exchange of thirty kilograms of cocaine for a purchase price of $570,000, Mr. Sierra gave Agent Gallo a sample of the drug. A week later, Mr. Sierra picked up nine kilograms of cocaine from co-defendant Ramon Garcia's residence in El Paso and delivered it to Agent Gallo in a fifty pound pet-food bag. Agents found an additional 700 grams of cocaine in Mr. Garcia's home. Given this evidence, a jury could easily find the existence of a conspiracy to distribute cocaine.

Furthermore, little doubt remains Mr. Mendoza understood the objectives of the conspiracy and knowingly and voluntarily participated in the illegal activity. Defendant inquired about the types and quantities of drugs Agent Gallo desired, promised the agent's safety, arranged the introductory meeting with his immediate supplier, actively participated in the sale terms, and stood by Mr. Sierra when his co-defendant passed Agent Gallo a sample of cocaine. Mr. Mendoza insisted that his supplier sold "good stuff" and the business involved "reputable people." Additionally, defendant identified himself as a key figure in the organization, repeatedly using the pronoun "we" when conversing with Agent Gallo. Mr. Mendoza even attempted to secure his role in the conspiracy by demanding that Agent Gallo negotiate directly with him in all future transactions because he worked hard to find good clients.

Nevertheless, Mr. Mendoza claims the evidence shows he never participated in the transactions, but merely "acquiesced to the importunities of the informer." Citing several cases from other circuits, he asserts that "[t]o sustain a conspiracy conviction there must be 'more than suspicion, more than knowledge, acquiescence, carelessness, indifference, or lack of concern.'" *See, e.g., United States v. Townsend*, 924 F.2d 1385, 1392–93 (7th Cir.1991). He also contends the reviewing court should not lightly infer defendant's knowledge of and acquiescence in a conspiracy. *See United States v. Hernandez–Palacios*, 838 F.2d 1346, 1348 (5th Cir.1988).

While we will not presume a defendant's involvement in a conspiracy, we have long held that "the common plan or purpose may be inferred from a combination of circumstances." *Savaiano*, 843

F.2d at 1293 (citing *Jordan v. United States*, 370 F.2d 126 (10th Cir.1966), *cert. denied*, 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 595 (1967)). Once the existence of a conspiracy is shown, " '[t]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt.' " *Savaiano*, 843 F.2d at 1294.

While the evidence shows Mr. Mendoza played only a limited role in the illegal activity, he " 'knowingly contributed his efforts in furtherance [of the conspiracy].' " *Savaiano*, 843 F.2d at 1293 (quoting *United States v. Andrews*, 585 F.2d 961, 974 (10th Cir.1978)) (emphasis omitted). Without Mr. Mendoza's aid, the drug exchange might not have transpired. *See United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir.1986) (conspiracy conviction upheld based on defendant's essential role as broker which ultimately was "helpful to the consummation of the [cocaine] transaction"). From the extent of Mr. Mendoza's participation in and apparent knowledge of the distribution scheme, a jury could properly conclude he was an integral link in the sale of cocaine.

## IV. EVIDENTIARY OBJECTIONS

Next, Mr. Mendoza argues the district court abused its discretion by allowing into evidence cocaine and assorted firearms seized during the search of co-conspirator Garcia's residence. Defendant claims this evidence was irrelevant to his conspiracy charge and highly prejudicial. On appeal, we review a district court's decision to admit or exclude evidence only for an abuse of discretion. *United States v. Harmon*, 918 F.2d 115, 117 (10th Cir.1990); *United States v. Cuch*, 842 F.2d 1173, 1175 (10th Cir.1988). We will not disturb the district court's decision unless we have a definite and firm conviction it "made a clear error of judgment or exceeded the bounds of

permissible choice in the circumstances." *Ortiz*, 804 F.2d at 1164 n. 2. We are not left with such a conviction here.

### Relevance

Mr. Mendoza challenges the relevance of the cocaine and firearms because he claims the government produced no evidence connecting him to Mr. Garcia or Mr. Garcia's residence where agents found the items.[5] Even if a link existed, Mr. Mendoza claims he was so far removed from the cocaine and the firearms that neither is relevant to the conspiracy charge against him. We disagree.

As a preliminary matter, we find little substance in Mr. Mendoza's claim that no evidence connected him to Mr. Garcia or the evidence seized at co-defendant's El Paso home. Although the government produced no direct evidence placing Mr. Mendoza specifically at the Garcia residence, the evidence at trial clearly linked Mr. Mendoza to Mr. Salas, and Mr. Salas to Mr. Garcia, in a common conspiracy to distribute cocaine. Although Mr. Mendoza attempted to distance himself from co-defendants Garcia and Salas at trial, as well as his role in the distribution scheme, the government can prove drug conspiracy cases entirely through circumstantial evidence. *United States v. Troutman*, 814 F.2d 1428, 1446–47 (10th Cir.1987). However, we need not restate or dwell on the specific evidence linking Mr. Mendoza to Mr. Garcia. As noted previously, a defendant "need not have knowledge of all ... the members of the conspiracy" to share liability for the criminal activity. *Savaiano*, 843 F.2d at 1294. Once implicated in the scheme, "the acts attributable to any member of the conspiracy are attributable to all other members." *Troutman*, 814 F.2d at 1446.

Under Fed.R.Evid. 401, relevant evidence is evidence that tends to make the exist-

---

5. The government asserts Mr. Mendoza objected to the admission of the firearms but failed to object to the introduction of the cocaine. The government argues this court must therefore review introduction of the cocaine into evidence for plain error only. Although it is clear Mr.

Mendoza's attorney failed to object to admission of the cocaine, we need not dwell on this issue since we find no error with the district court's decision to admit the cocaine and firearms into evidence.

ence of any fact "of consequence to the determination of the action more probable or less probable than it would be without the evidence." Except for certain well-defined instances, all relevant evidence is admissible. Fed.R.Evid. 402.

Because the cocaine and weapons seized at Mr. Garcia's house were probative of Mr. Garcia's role in the conspiracy, the government was free to introduce the items as relevant evidence of Mr. Mendoza's role in facilitating the transaction. At no point did Mr. Mendoza affirmatively withdraw from the conspiracy to relieve himself of liability for the acts of co-conspirators Sierra and Garcia, or the incriminating evidence found in their possession. *See United States v. Parnell*, 581 F.2d 1374, 1384 (10th Cir.1978), *cert. denied*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979).

█ Furthermore, the government did not seek to prove Mr. Mendoza exercised dominion or control over the cocaine or weapons seized at Mr. Garcia's house. Instead, the government introduced the evidence to support its hypothesis that Mr. Mendoza served as a front man for Mr. Sierra and Mr. Garcia in arranging kilogram sales of cocaine. Admitting evidence of drugs or weapons to support the government's theory of a drug conspiracy is generally not improper. *See United States v. Martinez*, 938 F.2d 1078, 1084 (10th Cir. 1991) (quoting 1 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 401[05], at 401–33, for the comparative proposition that evidence that assists " 'the trier of fact in evaluating the validity of an evidential hypothesis may be admissible even though it may not directly relate to a consequential fact' "). In this context, both the cocaine and weapons were also relevant.

Finally, the district court specifically found a proper inference arose between the weapons and their probable purpose to protect the narcotics. Evidence of weapons or other paraphernalia used in distributing illicit drugs is relevant. *See Sullivan*, 919 F.2d at 1420 (citing 1 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 401[10], at 401–70 & n. 14 (a collection of cases), and

*United States v. Romero*, 692 F.2d 699, 705 (10th Cir.1982)).

*Prejudice*

█ Although the introduction of cocaine and a large number of weapons creates some risk of undue prejudice, we are convinced the probative value of the evidence here outweighed the risk of any undue prejudice. "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case." *Martinez*, 938 F.2d at 1082. Instead, "the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " *Id.* (quoting Fed.R.Evid. 403 advisory committee's note). "[B]alancing the probative value of evidence against its potential prejudicial effect" remains a matter of broad discretion with the district court, *id.*, and we see no reason to disturb its ruling.

Borrowing from this court's prior use of a " 'mosaic' analogue" regarding evidence, " 'all the evidence was mosaic, each making its contribution, and all building up to a compelling whole that ... the jury should actually view.' " *Troutman*, 814 F.2d at 1447 (quoting *United States v. Masiello*, 235 F.2d 279, 283 (2d Cir.), *cert. denied*, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956)). The jury weighed Mr. Mendoza's claims of indifference and that the government unwittingly duped him into locating a cocaine supplier against inculpatory evidence that he arranged and attended the introductory meeting between co-defendant Sierra and Agent Gallo, guaranteed the safety of the DEA agents, promised delivery of a sample of cocaine and assured agents he could supply kilogram quantities of the drug.

Using the same " 'mosaic' analogue" here sheds better understanding on the probative value of the cocaine and firearms introduced against Mr. Mendoza. The "individual pieces of evidence, properly juxtaposed, create a compelling picture" of Mr. Mendoza's knowledge of a conspiracy to distribute large quantities of cocaine through his concerted efforts with co-de-

fendants Sierra and Garcia. *Troutman,* 814 F.2d at 1447.

The courts generally view items such as firearms, large quantities of cash, and uncharged quantities of drugs as "tools of the trade" for distributing illegal drugs. We adopted this rationale in *Martinez,* 938 F.2d at 1083; *see also United States v. McDonald,* 933 F.2d 1519, 1522 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991). Such evidence is probative of "an accused's participation in the drug distribution business and; more specifically, his or her participation in the charged distribution offenses." *Martinez,* 938 F.2d at 1083. In admitting firearms evidence, courts have recognized the high level of violence generally associated with the drug distribution business. *Id.* Therefore, those who conspire with individuals utilizing firearms in their drug business run the risk the government will introduce as evidence those weapons or violence resulting from their use. Rather than offer a convincing argument how introduction of the cocaine and firearms caused the jury to decide his case on an improper basis, Mr. Mendoza merely suggests the evidence unfairly damaged his position. Defendant's arguments are insufficient to preclude admission of the evidence. Even had the government not introduced the firearms, ample evidence existed to support the jury's guilty verdict on conspiracy charges. We see no undue prejudice to Mr. Mendoza's case resulting from admission of the evidence.

### Prior Bad Acts

 Next, Mr. Mendoza argues the government offered the firearms as evidence of other crimes, wrongs or acts which are inadmissible to prove character under Fed.R.Evid. 404(b). Because the government did not charge any of the defendants with weapons violations, Mr. Mendoza contends the firearms were extrinsic evidence inadmissible pursuant to *United States v. Record,* 873 F.2d 1363 (10th Cir. 1989). As the government correctly points out, however, Mr. Mendoza's counsel objected to the weapons only on grounds of relevance and prejudice. Mr. Mendoza did not object to the firearms as Rule 404(b) evidence, nor did the government offer the evidence for that purpose.

In order to preserve alleged error for appeal, a party must make a timely and proper objection, " '*stating the specific ground of objection,* if the specific ground was not apparent from the context.' " *United States v. Taylor,* 800 F.2d 1012, 1017 (10th Cir.1986), *cert. denied,* 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987) (quoting Fed.R.Evid. 103(a)(1)) (emphasis in original). On appeal, the specific ground for reversal on an evidentiary ruling must mirror the objection raised at trial. 800 F.2d at 1017 (citing *Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1331 (10th Cir.1984)). However, Mr. Mendoza raises his § 404(b) objection for the first time on appeal. Absent a timely and proper objection, the alleged error is waived for appeal "except when it constitutes plain error resulting in manifest injustice." 800 F.2d at 1017. We find Mr. Mendoza suffered no manifest injustice arising from admission of the evidence here.

 On a related claim of error regarding admission of the weapons, Mr. Mendoza argues the district court failed to specifically articulate "the relevant purpose and specific inferences to be drawn from each proffer of evidence of other acts" as required by *United States v. Kendall,* 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). We find defendant's argument without merit for two reasons. First, *Kendall* focused solely on the admission of Rule 404(b) evidence. Here, the government did not present the firearms as evidence of other crimes, wrongs or bad acts of the defendant, nor did Mr. Mendoza object to the items as Rule 404(b) evidence. The government introduced the weapons to prove Mr. Garcia served as the source of cocaine in the conspiracy, and the firearms safeguarded the supply. Second, the district court clearly articulated the purpose for admitting the firearms, noting the jury could draw a proper inference between the weapons and their intended use to protect the drugs. The district court did not abuse

its discretion in admitting the firearms into evidence. *See United States v. Williams,* 923 F.2d 1397, 1401 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991) (even where district court fails to identify the purpose for which it admits possible Rule 404(b) evidence, such error is harmless if its purpose is apparent from the record and admission was correct).

## V. MR. GARCIA'S MOTION TO SUPPRESS

Prior to trial, Mr. Garcia unsuccessfully attempted to suppress from evidence the cocaine and firearms seized at his house. He claimed the evidence was excludable because the agents lacked probable cause to believe he possessed drugs in his residence and no exigent circumstances existed which justified a warrantless entry. Mr. Garcia claimed officers had no objectively reasonable grounds to arrest him on an unrelated warrant because his physical appearance did not match the physical characteristics of the named individual. He also asserted his wife's consent to search the premises was not voluntary.

During the suppression hearing, both defendant's wife and his sister testified that Mrs. Garcia did not sign the consent form voluntarily. Mrs. Garcia claimed she signed only out fear after officers entered the house with guns drawn, ordered her not to move, and arrested her husband because he refused to consent to the search. Mrs. Garcia testified agents threatened to keep her family members in the house until the officers obtained a warrant and threatened her arrest unless she consented to the search. Mrs. Garcia adamantly denied telling the agents to "go ahead and search." She also claimed the agents searched the bedroom and discovered the weapons before she signed the consent form.

In contrast, the government presented evidence tending to show agents entered the house with the consent of Mr. Garcia's eleven-year-old son, as well as evidence exigent circumstances and probable cause justified a warrantless entry. Prosecutors also argued the agents had probable cause to arrest Mr. Garcia on the outstanding warrant based on his likeness to the individual named in the warrant. Furthermore, the government presented testimony refuting Mrs. Garcia's claim that agents coerced her into signing the consent form.

The district court denied Mr. Garcia's motion, believing the agents' version of the incident.[6] The district court concluded the agents had sufficient probable cause to believe twenty-one kilograms of cocaine remained in Mr. Garcia's house, and exigent circumstances justified the warrantless entry because the agents reasonably believed defendant might otherwise destroy the evidence. The district court also found the warrantless entry necessary for the safety of the agents. Acknowledging some question remained as to whether the agents obtained permission to enter Mr. Garcia's house, the court noted only that agents walked in after identifying themselves as DEA agents to the child who answered the door. The district court also determined the agents acted properly in arresting Mr. Garcia because they reasonably believed he was the same individual named in an outstanding warrant. Furthermore, it found

---

**6.** Mr. Garcia faced related drug charges in the Western District of Texas in which he moved to suppress evidence seized during the same warrantless search of his house as challenged here. The District Court for the Western District of Texas reached an opposite conclusion with respect to Mr. Garcia's motion to suppress. The district court ruled the evidence inadmissible because it found the agents lacked probable cause to believe Mr. Garcia stored cocaine in his house and because the agents articulated no exigent circumstances justifying a warrantless search of the premises. The court also noted that if sufficient time remained to obtain a

warrant, no exigent circumstances existed. The district court found agents did not obtain Mrs. Garcia's voluntary consent because the events "created an atmosphere that was coercive in the extreme." As a result, the government dropped the additional charges against Mr. Garcia.

Although defendant concedes this order is not part of the record, he presumably filed it with this appeal as persuasive authority on the suppression issues. We decline to consider the order on appeal, however, since it is not part of the record before us and we do not know what evidence the parties presented at that hearing. *See generally* Fed.R.App.P. 10(a).

Mrs. Garcia's consent voluntary, made without duress or coercion and given with full knowledge of her right to refuse consent.

## VI. ADMISSIBILITY OF THE EVIDENCE

Mr. Garcia contends the district court erred by denying his motion to suppress evidence of cocaine and firearms seized by agents during the warrantless entry and search of his home. He makes two arguments. First, he claims the government articulated no exigent circumstances justifying the agents' warrantless entry into his home, thereby rendering the seized evidence inadmissible under the exclusionary rule adopted in *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Second, he asserts even if this court finds the entry legal, his wife did not freely and voluntarily consent to a search of the premises because the events created an atmosphere "coercive in the extreme."

### A.

Both parties engage in lengthy arguments over the contours sufficient to establish exigent circumstances. Mr. Garcia clings to the well-settled doctrine that entry into the home absent a warrant is presumptively unreasonable, *see Payton v. New York*, 445 U.S. 573, 583–90, 100 S.Ct. 1371, 1378–82, 63 L.Ed.2d 639 (1980), particularly where agents made no attempt to secure a warrant before entering despite having several hours to do so.

The government argues the reviewing court must consider "the realities of the

situation." Notably, the government claims a significant danger existed that Mr. Garcia would destroy evidence when Mr. Sierra failed to return for the second delivery in the two-part drug transaction. Prosecutors also cite the potential danger to the officers resulting from Mr. Garcia's possession of firearms. Finally, the government claims evidence indicated Mr. Garcia's son consented to the agents' initial entry into the house, although the district court made no clear finding on this issue.

We need not decide the issues of exigent circumstances or whether the agents obtained consent for their initial entry into the house. For analysis purposes only we will treat the agents' warrantless entry as a Fourth Amendment violation.[7] As a result, we narrow our inquiry to whether Mrs. Garcia's consent to search the residence was " 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416); *see also United States v. Guzman*, 864 F.2d 1512, 1520 (10th Cir.1988).

### B.

 A search preceded by a Fourth Amendment violation remains valid if the subsequent "consent is voluntary in fact, in light of the totality of surrounding circumstances." *Guzman*, 864 F.2d at 1520 n. 9; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). To determine if such consent was sufficiently an act of free will to purge the primary taint of the unlawful

---

**7.** Although we do not decide the issue here, we express our deep concern over the agents' failure to begin the warrant process before entering Mr. Garcia's house. This court has "never held that police can automatically justify the warrantless entry of a home merely by engaging in a two-part drug transaction and interrupting it after the first part." *United States v. Aquino*, 836 F.2d 1268, 1273 (10th Cir.1988). We note that our previous cases involving exigent circumstances have emphasized that the police "began the process of obtaining a warrant as soon as they had probable cause." *Aquino*, 836 F.2d at 1273–74. Here it appears agents had several

hours to initiate attempts to obtain a warrant. As we noted in *Aquino*, "[t]he officers' failure to begin the process of obtaining a warrant is especially troubling in a case involving a home, concerning as does the privacy interests of innocent individuals who might, as here, be living with the suspected drug dealer." *Id.* at 1274. Not only does proper observance of the warrant requirement protect individuals' privacy interests, but it also prevents police from needlessly jeopardizing the government's case against suspected drug dealers. *Id.; see also United States v. Chavez*, 812 F.2d 1295, 1300 (10th Cir.1987).

invasion, the district court should apply the taint analysis articulated in *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62, which applies to confessions. *See United States v. Maez*, 872 F.2d 1444, 1454 (10th Cir. 1989); *Guzman*, 864 F.2d at 1520–21. Among the factors which warrant consideration are "[t]he temporal proximity of the [Fourth Amendment violation] and the [consent], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (citations omitted). Generally, we review the district court's findings on a motion to suppress under the deferential clearly erroneous standard, because "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters" most appropriate for the district court. *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). This holds "particularly true where, as here, the credibility of witnesses is important on the issue of voluntariness." *Guzman*, 864 F.2d at 1521.

However, the district court conducted no formal taint analysis because it found probable cause and exigent circumstances justified the agents' initial entry and arrest of Mr. Garcia. Instead, the court analyzed only the basic question of voluntariness under the three-factor test articulated in

*United States v. Werking*, 915 F.2d 1404, 1409–10 (10th Cir.1990), and concluded Mrs. Garcia unequivocally and freely consented to the search of her property.[8]

The appellate court's function is not to relitigate facts or substitute a new view of the facts for the district court's findings. *Guzman*, 864 F.2d at 1521. Instead, where the district court did not undertake the legal inquiry mandated by *Brown* and *Wong Sun* "to evaluate the circumstances of this case in light of the policy served by the exclusionary rule," *and* where the proceedings below "resulted in a record of amply sufficient detail and depth from which the determination may be made," the appellate court may conduct the taint analysis. *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262; *see also Guzman*, 864 F.2d at 1521 n. 10.[9] Because we assume a Fourth Amendment violation occurred, we must deduce from the totality of the facts whether Mrs. Garcia's consent was sufficiently voluntary to purge the primary taint of the agents' initial unlawful entry. *See Maez*, 872 F.2d at 1454. Like the district court, we engage in only "the most careful scrutiny" when reviewing the voluntariness of consent, *Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2048, bearing in mind the government carries the burden of proving the taint has been alleviated. *Guzman*, 864 F.2d at 1521 (citing *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045).

---

8. Under *Werking:*
 (1) There must be clear and positive testimony that consent was "unequivocal and specific" and "freely and intelligently" given; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against waiver of fundamental constitutional rights and there must be convincing evidence that such rights are waived.
 915 F.2d at 1409–10.

9. Mr. Garcia contends the district court failed to weigh his wife's possible vulnerable *subjective* state when she allegedly consented to the search, and instead incorrectly weighed her testimony under an objective standard. He bases his claim on the district court's conclusion that "[w]hatever [fear or threats] existed [were

those] of Mrs. Garcia's own perceptions, and ... her own apprehension or misapprehension of the facts.... That it was her own erroneous conclusion that [her husband] was ... arrested ... for failure to consent to the search." When examining the totality of the circumstances to determine "if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly *vulnerable subjective state* of the person who consents." *Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2049 (emphasis added). Restated, the test is not whether a reasonable person would have felt coerced, but whether the consenting party felt coerced under the existing circumstances. *See Maez*, 872 F.2d at 1459 n. 2 (Brorby, J. dissenting). We need not decide this issue because the record is sufficiently detailed for us to conduct the taint analysis, including the threshold question of voluntariness.

The threshold inquiry of the taint analysis centers on the voluntariness of the party's stated consent. *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. While appellate review of this issue remains complex and " 'no single fact is dispositive,' " *Guzman*, 864 F.2d at 1520 (quoting *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261), one circumstance distinguishes the present case from the majority of our prior decisions involving the voluntariness question. Agents testified they did not solicit Mrs. Garcia's consent. Instead, Mrs. Garcia broached the search issue herself after officers told her they believed cocaine existed on the premises. Insisting she knew nothing about cocaine, Mrs. Garcia urged the agents to "go ahead and search." Only then did agents ask her to reduce the consent to writing. While her unsolicited consent does not end the inquiry, it weighs heavily into our conclusion that agents did not coerce Mrs. Garcia into signing the consent form. At the point Mrs. Garcia initially implored the agents to search her home, officers had not approached her for consent, nor had agents expressed an interest in obtaining her approval for a search. As one agent explained, the idea of obtaining consent had been "abandoned, for all intents and purposes," after her husband denied officers permission to search.

Next, we examine Mrs. Garcia's purported consent in light of the factors set forth in *Brown*, to ensure her statement was an act of free will, and not the result of duress, coercion, or other misconduct arising out of the agents' warrantless entry. While the elements of time, intervening circumstances and police misconduct are relevant considerations under *Brown*, the ultimate finding of voluntariness turns on the overall facts of the case. *See* 422 U.S. at 603, 95 S.Ct. at 2261.

Considered alone, the proximity of the agents' entry to Mrs. Garcia's consent reveals little about whether the thirty to forty-five minutes that elapsed had any effect on her decision to permit the search. We know only that Mrs. Garcia remained in her home until she issued consent.

However, numerous circumstances intervened during this period to purge the primary taint of the agents' warrantless entry. After entering the house, agents gathered all the occupants together in the living room. By this time, the atmosphere had quieted so substantially that those officers who entered the house with weapons drawn felt relaxed enough to put them away. Agents then interviewed Mr. Garcia concerning his identity, his ownership of the house and his ownership of a bar in El Paso. Ample time existed to run a warrant check on Mr. Garcia and make attempts to ascertain whether he was the same individual named in an outstanding arrest warrant. Agents also interviewed all nine other occupants of the house to determine their identities and check their names for outstanding warrants. During this period, the individuals remained free to use the bathroom and kitchen facilities. Agents testified Mrs. Garcia appeared calm, friendly and cooperative during this process, despite their presence and her husband's arrest. At this point, Mrs. Garcia had no reason to be upset beyond what the district court described as "the normal nervousness" accompanying the situation because Mr. Garcia assured her the agents made a mistake about his identity and "he should be right back." One of the agents also assured Mrs. Garcia that police took her husband into custody only to verify his identity and they intended to bring him home if he was not the same individual named in the warrant. Agents also carefully explained they suspected cocaine on the premises and officers would remain while they attempted to secure a search warrant.

Soon thereafter, Mrs. Garcia invited the agents to search the house. Before commencing a search, however, the agents provided Mrs. Garcia with a consent form which they carefully explained to her in her native Spanish language. Agents also advised Mrs. Garcia of her right to withhold consent. Mrs. Garcia asked no questions about the consent form, her rights or the search itself before signing. She also indicated she understood the document. At no time did she withdraw her consent. We

firmly believe these events attenuated any duress or coercive effect brought about by the agents' warrantless entry.

With respect to the purpose and flagrancy of the violation, the record does not indicate the officers intentionally disregarded the warrant requirement. Unlike *Brown*, the agents here were not aware of the possible impropriety of their actions. *See* 422 U.S. at 605, 95 S.Ct. at 2262. Agents entered the house believing Mr. Garcia stored large quantities of cocaine on the premises and reasoning they had no time to obtain a warrant. Defendant does not dispute that officers had probable cause for their entry but questions only whether exigent circumstances overshadowed the need for a warrant. Although we question the wisdom of entering the house without at least initiating the warrant process, the agents produced uncontradicted testimony that they intended only to secure the residence and then either obtain consent or a search warrant before proceeding further. Aside from a protective sweep of the premises for the safety of the officers, no search took place until Mrs. Garcia volunteered her consent. Whether exigent circumstances justified the officers' warrantless entry remains a close call. However, we see no evidence of other police actions amounting to purposeful or flagrant misconduct.

Granted, much of Mrs. Garcia's testimony contradicts that given by government witnesses. However, the district court rejected her version of the events. Although we view the record more critically here than if we applied the clearly erroneous standard to the district court's findings, we are not inclined to rewrite its assessment of the totality of the facts and circumstances. Undoubtedly, the district court sits in a far better position to gauge the credibility of the witnesses than we could ever be looking at the lifeless pages of a transcript. We have reviewed the record and agree with the district court "[t]hat nothing was said to [Mrs. Garcia] that would lead her to believe that she was under an obligation to consent to the search."

We have carefully weighed Mr. Garcia's additional arguments against the totality of the circumstances and the three factors set forth in *Brown* and *Guzman*. We remain convinced Mrs. Garcia's consent was unequivocal, freely given, and not obtained as the result of any improper police coercion or duress. Our circuit does not believe that under *Wong Sun* or *Brown*, "the Government is required to show attenuation beyond a finding of voluntary, valid consent under Fourth Amendment standards." *United States v. Carson*, 793 F.2d 1141, 1153 (10th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986). As a result, Mrs. Garcia's valid consent sufficiently purged the agents' warrantless entry of any primary taint, thereby rendering the search valid. Accordingly, the district court properly accepted into evidence the cocaine and weapons found in Mr. Garcia's house.

## VII. RIGHT TO COUNSEL OF CHOICE

The district court originally scheduled Mr. Garcia's trial for July 30, 1990, but it granted defendant's first motion to continue the proceeding on the belief that a pending motion to suppress evidence in a separate three-count indictment in the United States District Court for the Western District of Texas might resolve disputed evidentiary issues. The unresolved suppression hearing in Texas focused, at least in part, on the same warrantless search of Mr. Garcia's residence at issue here. Prosecutors did not oppose the motion, and the court rescheduled the case for September 24, 1990.

Twenty-one days before trial, Mr. Garcia's privately retained attorney entered the hospital for emergency medical treatment. Mr. Garcia filed a second motion to continue the trial, renewing the same grounds alleged in his original motion for continuance, but without mentioning his attorney's illness. The district court denied the motion. Mr. Garcia and the government filed a joint motion for reconsideration. Both parties argued for a continuance, claiming an agreed disposition in the present case hinged on the outcome of Mr.

**1014**

Garcia's undecided motion to suppress in Texas. The parties also notified the court that an unexpected medical problem rendered Mr. Garcia's attorney unable to represent the defendant until early October. They noted the law partner of Mr. Garcia's hospitalized attorney could not appear on defendant's behalf because of scheduling conflicts. Furthermore, the parties claimed the law partner felt unable to prepare a legally adequate defense with only four days until trial. The district court denied the motion for reconsideration September 20, 1990, without comment.

Later that day, Mr. Richard Jewkes and Mr. Joe Edd Boaz, two other attorneys associated with defendant's hospitalized counsel, met with Mr. Garcia for the first time. Mr. Garcia told them he did not want them to represent him because he lacked confidence in their ability. Instead, Mr. Garcia attempted to privately retain a second law firm for his defense. Attorneys at the new firm advised Mr. Garcia they would accept the case, but only if he obtained a continuance to allow them time to prepare for trial.

On the day of trial, the district court refused to hear either Mr. Jewkes or Mr. Boaz on the subject of a continuance, although they stressed Mr. Garcia's original attorney could try the case within a week.[10] The district court also refused to let Mr. Garcia speak on his own behalf, noting "I'm not going to hear anything on the continuance ... and I really don't care what Mr. Garcia has to say." Immediately thereafter, the case proceeded.

■ Mr. Garcia contends the district court denied his Sixth Amendment right to counsel of choice when it forced him to trial represented by counsel whom he met only four days earlier, and whom he wanted to fire. The government counters that Mr. Jewkes appeared as co-counsel on June 7, 1990, and therefore Mr. Garcia was indeed represented by counsel of choice.[11] The government also asserts defendant had adequate time to prepare his defense.

■ The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall ... have the assistance of counsel for his defense." U.S. Const. amend. VI. As Mr. Garcia correctly points out, "[t]he right to counsel of choice has been described as an 'essential component' of the sixth amendment right to counsel." *United States v. Nichols*, 841 F.2d 1485, 1501 (10th Cir.1988).[12] An accused should "'be afforded a fair opportunity to secure counsel of his own choice,'" *Collins*, 920 F.2d at 624–25 (quoting *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932)), and "'must be given a reasonable opportunity to employ and consult with counsel; otherwise the right to be heard by counsel would be of little worth.'" *Id.* at 625 n. 7 (quoting *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942)). The right to privately retain counsel of choice derives from a defendant's right to determine the type of defense he wishes to present. *Collins*, 920 F.2d at 625; *Nichols*, 841 F.2d at 1502. Lawyers are not fungible, and often "'the most important decision a defendant makes in shaping his defense is his selection of an attorney.'" *Collins*, 920 F.2d at

**10.** An attorney for the second firm defendant contacted also expressed Mr. Garcia's desire to fire the firm represented by Mr. Jewkes and Mr. Boaz unless his original attorney handled the case.

**11.** Mr. Garcia asserts Mr. Jewkes was attorney of record in name only since he never actually appeared on behalf of the defendant until the day of trial. He also claims he was not aware of Mr. Jewkes or his association with his original attorney until four days prior to trial. Although it is not part of the record, Mr. Garcia's attorney on appeal notes that Mr. Jewkes probably entered his appearance for Mr. Garcia be-

cause he was licensed in New Mexico and defendant's original attorney was not.

**12.** A defendant's right to secure counsel of choice is cognizable only to the extent defendant can retain counsel with private funds. *United States v. Collins*, 920 F.2d 619, 625 n. 8 (10th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991). In contrast, "'an indigent defendant does not have a right to choose appointed counsel.'" *Id.* (quoting *Nichols*, 841 F.2d at 1485). Regardless of whether counsel is retained or appointed, both are held to the same standards of professional competence. *Id.*

625 (quoting *Nichols,* 841 F.2d at 1502). In situations where a defendant is able to privately retain counsel, "the choice of counsel rests in his hands, not in the hands of the state." *Id.* In criminal cases, the right to retain counsel of choice becomes a question of fundamental fairness, "the denial of which may rise to a level of a constitutional violation." *Id.* at 625; *see also Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674 (1984). A conviction attained when a court "unreasonably or arbitrarily interferes with an accused['s] right to retain counsel of choice ... cannot stand, irrespective of whether the defendant has been prejudiced." *Collins,* 920 F.2d at 625.

However, the courts have long recognized limits on the right to counsel of choice, stating "[t]he precise contours of this right ... have not yet been determined," *Nichols,* 841 F.2d at 1501, and the "right to retain counsel of ... choice is not absolute," *Collins,* 920 F.2d at 625; *see also Nichols,* 841 F.2d at 1502 (also noting in n. 7 at 1501, that the Supreme Court has never decided a case squarely on the basis of the right to counsel of choice); *Powell,* 287 U.S. at 53, 53 S.Ct. at 58 (defendant's right to choose his own attorney is limited to "fair opportunity" to obtain counsel of choice). A defendant may not insist upon counsel of choice in a manner which obstructs orderly procedure in the courts or deprives courts of the exercise of their inherent powers to control the orderly course of justice. *Collins,* 920 F.2d at 625.

■ While we recognize the right to choose and be represented by one's preferred attorney is encompassed by the Sixth Amendment, the Supreme Court reminds us that the "essential aim of the Amendment is to *guarantee an effective advocate* for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) (emphasis added); *see also Collins,* 920 F.2d at 625–26 (and cases cited therein). However, the court must respect a defendant's choice of

retained counsel " 'unless it would unreasonably delay proceedings or burden the court with retained counsel who was incompetent or unwilling to abide by court rules and ethical guidelines.' " *Collins,* 920 F.2d at 626 (quoting *United States v. Panzardi Alvarez,* 816 F.2d 813, 818 (1st Cir.1987)). In short, courts may deprive defendants of their preferred counsel " 'only where such drastic action is necessary to further some overriding social or ethical interest.' " *Id.* at 626 (quoting *United States v. Hobson,* 672 F.2d 825, 828 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982)).

Therefore, the courts must "balance a defendant's constitutional right to retain counsel of ... choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice." *Collins,* 920 F.2d at 626; *see also Nichols,* 841 F.2d at 1503–04. In weighing this balance, courts may consider whether a continuance to allow one's preferred attorney to handle the case "would inconvenience witnesses, the court, counsel, or the parties; whether other continuances have been granted; whether legitimate reasons exist for the delay"; or whether the defendant contributed to the circumstances which gave rise to the request for a continuance. *United States v. Kelm,* 827 F.2d 1319, 1322 n. 2 (9th Cir.1987). Similarly, courts may consider whether defendant has other competent counsel prepared to try the case, with attention to whether defendant obtained the other counsel as lead or associate counsel; whether rejecting defendant's request for delay will result in identifiable prejudice to his case; whether this prejudice constitutes a material or substantial harm; and whether the complexity of the action or other relevant factors peculiar to the specific case necessitates further delay. *United States v. Burton,* 584 F.2d 485, 491 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979).

Against these parameters we now consider Mr. Garcia's claim that the district court lacked an interest of sufficient magnitude to overcome his Sixth Amendment right to

counsel of choice. Mr. Garcia asserts his inability to retain counsel of choice resulted in the loss of a basic privilege, which entitles him to a new trial. We disagree.

 Foremost, we note Mr. Jewkes emerged as Mr. Garcia's attorney of record nearly two and one-half months prior to trial and appeared ready to try the case. Neither Mr. Garcia nor his two acting attorneys indicated to the court the limited time before trial impeded their ability to prepare an adequate defense. Furthermore, Mr. Garcia does not claim attorneys Jewkes and Boaz represented him ineffectively, nor does he assert prejudice due to the absence of his preferred counsel. Citing *Collins*, 920 F.2d at 625, Mr. Garcia asserts he need not claim ineffective assistance of counsel where the district court denied him a right to counsel of choice. Our holding in *Collins* is not so broad. Only when the trial court *unreasonably or arbitrarily interferes* with a defendant's right to counsel of choice do we agree a conviction cannot stand, "irrespective of whether the defendant has been prejudiced." *See id.* at 625 (emphasis added). Because the factors influencing a particular case often vary, the district court enjoys broad discretion on matters of continuances, even when the parties implicate Sixth Amendment issues. *Nichols*, 841 F.2d at 1504; *see United States v. Cronic*, 466 U.S. 648, 662 n. 31, 104 S.Ct. 2039, 2048 n. 31, 80 L.Ed.2d 657 (1984); *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983). *But cf. Hobson*, 672 F.2d at 827–28 (where Sixth Amendment right to counsel is implicated in a criminal case, abuse of discretion standard is too deferential). Absent a showing the district court unreasonably or arbitrarily interfered with defendant's right to counsel of choice, we believe reversal is appropriate only when defendant identifies specific prejudice resulting from denial of

preferred counsel, *and* when such prejudice renders the trial fundamentally unfair. *See Cronic*, 466 U.S. at 662 n. 31, 104 S.Ct. at 2048 n. 31. Mr. Garcia claims no prejudice, nor do we see grounds for such a claim in the record.

 Hence, we inquire only whether the district court's denial of a continuance was so unreasonable or arbitrary that Mr. Garcia is entitled to a new trial. Although another district court may have granted a second continuance under these circumstances, we are not convinced the district court here based its decision on unreasonable or arbitrary factors constituting reversible error. Although the district court articulated no reasons for its decision,[13] it remained free to balance the numerous factors articulated here in rejecting Mr. Garcia's motion. Specifically, the district court could consider its prior grant of a continuance to the defendant, and whether a second continuance would inconvenience witnesses or the court. While both the government and defendant argued the outcome of the pending suppression hearing in Texas might result in an agreed disposition between the parties, presumably contributing to judicial economy, that factor alone is not dispositive. The district court was free to weigh the potential for judicial economy resulting from a continuance against the potential for judicial economy gained by simply disposing of the case. Additional factors also warranted consideration. The government's case against Mr. Garcia remained relatively simple alleging only one illegal transaction and consisting primarily of evidence obtained at the time of his arrest. Furthermore, as attorney of record for over two months, Mr. Jewkes presumably understood the prevailing issues and defense strategies relative to the case. Mr. Boaz, as co-counsel, was available to share any unexpected workload. *See United States v. Espinosa*, 771 F.2d

---

**13.** Where a Sixth Amendment right to retained counsel of choice is implicated, we believe the more prudent approach for the district court is to state its findings and rationale for denying a continuance on the record. This would allow the appellate court to more easily focus on the factors the district court considered in weighing the balance between an accused's right to counsel of choice and the orderly administration of justice. *See Collins*, 920 F.2d at 628 (where a district court *disqualifies* defendant's counsel of choice, "it *must* make findings on the record stating the rationale for its action") (emphasis added).

1382, 1410–11 (10th Cir.) (substitution of counsel one day prior to motion hearing and four days prior to trial did not prejudice defendant as ineffective counsel where original attorney's prior preparation simplified substitution attorney's work and case was not complex), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). The district court remained free to consider each of these points when it denied the continuance.

Again, we emphasize that Mr. Garcia does not assert a deficiency in his representation; he asserts only that he was not represented by counsel of choice and that choice was essential to a fair trial. While the Sixth Amendment incorporates a right to counsel of choice, that right may yield to the trial court's inherent power to maintain the integrity of the judicial process. As the Supreme Court noted in *Cronic:*

> "The fact that the accused can attribute a deficiency in his representation to a source *external* to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect."

466 U.S. at 662 n. 31, 104 S.Ct. at 2048 n. 31 (emphasis added). Mr. Garcia claims no prejudice to his case resulting from the district court's denial of his motion to continue the trial. Nor do we see any evidence the district court's ruling had an adverse effect on the trial process afforded to defendant. Instead, the record suggests his substitute attorneys provided nothing less than competent representation. The district court agreed, commending counsel "on an excellently tried case on both sides, especially ... Mr. Jewkes and Mr. Boaz." Accordingly, we have no basis to grant Mr. Garcia a new trial.

## VIII. CONCLUSION

In summary, the district court did not deprive Mr. Mendoza of due process or a fair trial by denying his request for disclosure of the identity of the government's confidential informer. We also hold the government did not entrap Mr. Mendoza as a matter of law, and the jury had ample evidence before it to reject his entrapment defense. The cocaine and firearms seized by the agents during their arrest of co-conspirator Garcia constituted relevant evidence of an ongoing drug conspiracy. Since evidence linked Mr. Mendoza to the conspiracy, the exhibits were fully admissible against him. Furthermore, the government produced sufficient evidence of Mr. Mendoza's role in the drug transaction for a jury to convict Mr. Mendoza of conspiracy to distribute cocaine.

The agents' warrantless entry into Mr. Garcia's house did not render the seized cocaine and firearms inadmissible under the exclusionary rule of *Wong Sun.* Mrs. Garcia's subsequent unequivocal and voluntary consent purged the warrantless entry of any primary taint. Finally, the district court did not commit reversible error by denying Mr. Garcia's motion for a continuance to allow his preferred attorney to represent him at trial. Mr. Garcia does not assert, nor do we find any evidence, that failure to be represented by counsel of choice prejudiced his case. Nothing in the record suggests he received anything less than the fair and competent representation envisioned by the Sixth Amendment.

For these reasons, the convictions of both Mr. Mendoza and Mr. Garcia are AFFIRMED.