**UNITED STATES of America,**
**Plaintiff,**

v.

**Fawaz Mohammed DAMRAH, aka**
**Fawaz Damra, Defendant.**

**No. 1:03–CR–484.**

United States District Court,
N.D. Ohio.
Eastern Division.

June 7, 2004.

Larry W. Zukerman, Zukerman, Daiker & Lear, Cleveland, OH, John D. Cline, Freedman Boyd Daniels, Hollander Goldberg & Cline, Albuquerque, NM, Joseph McGuinness, Cleveland, OH, Nancy Hollander, Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, Albuquerque, NM, for Fawaz Mohammed Damrah (1), aka Fawaz Damra (1), Defendants.

Cherie L. Krigsman, U.S. Department of Justice, Criminal Division, Washington, DC, James V. Moroney, Jr., Office of the U.S. Attorney, Northern District of Ohio, Ronald B. Bakeman, Office of the U.S. Attorney, Northern District of Ohio, Cleveland, OH, for United States of America, Plaintiff.

## ORDER

GWIN, District Judge.

In this case, the Defendant Fawaz Damrah asks the Court to suppress certain evidence obtained in a search of his house [Doc. 66]. The Government opposes the motion [Doc. 67].

Among the items seized during that search was a computer, certain computer CDs and certain documents. Given that this case involves the government's claim that Fawaz Damrah failed to disclose relevant associations in a 1993–94 citizenship application, the computer materials seized ten years later have no discernible relevance whatever to the charges pending in this case. The discussion contained herein may therefore prove to be academic. Regardless, the Court considers Damrah's motion, and for the reasons described below, GRANTS Defendant's motion to suppress.

## I. BACKGROUND

On January 9, 2004, this Court unsealed a previously filed indictment and issued a warrant for the arrest of Defendant Damrah. At approximately 8:30 a.m. on January 13, agents of the Joint Terrorism Task Force ("JTTF") appeared at Defendant's home in Strongsville, Ohio to execute the arrest warrant. The agents discovered Defendant, his wife Nasreen, and his eight-year-old daughter inside the home.

The agents instructed Nasreen Damrah and her daughter, who had missed the school bus, to wait in the basement while they arrested Defendant. Nasreen Damrah described this direction:

Q. Did one of the agents tell you and your daughter to go somewhere before Mr. Damrah was taken away?

A. Yes. One of the agents told me to go down to the basement. And when I stood by the door he told me

"no, go down." And he shut the door.

(Tr. 58). Nasreen Damrah described her state of mind at that point: "I was so scared and I was terrified, and I was crying." *Id.*

At approximately 9 a.m., the agents handcuffed Defendant Damrah and escorted him out the back door to avoid the media which awaited out front. Around this time, two female agents entered the home through the front door: FBI Special Agent Christine Oliver and JTTF agent Karen Garewal. Agents Oliver and Garewal arrived at the Damrah home after the arrest. Although Agents Oliver and Garewal arrived together (Tr. 6), they dispute whether Defendant Damrah was still in the home when they entered through the front door.[1] Regardless, the agents agree that they arrived after the officers had taken the Defendant into custody and had either removed Fawaz Damrah from the home or were in the final stages of removing him.

Further no evidence suggests that Agents Oliver and Garewal had any responsibilities associated with arresting Fawaz Damrah. Agent Garewal testified:

Q. How did you know to arrive at that point?

A. We were aware of when the arrest was taking place, and we were standing by outside to go in after Mr. Damrah was taken away from the home.

Q. You were standing by outside until Mr. Damrah had been taken away from the home?

A. Right.

Q. And your role, if I understood you correctly, was to talk with whoever was in the house, correct?

A. Right. That's correct.

Q. And your role was also to try to obtain the consent of whoever was within the house to search the house, correct?

A. That's correct.

Q. And you had a bunch of agents, four of them, as I recall, you went through the list, standing by to perform that search once you had obtained the consent, correct?

A. That's correct.

Q. And that was all planned in an advance?

A. That's correct.

(Tr. 18–19).

After her entry into the Damrah home and her efforts to locate Nasreen Damrah, Agent Garewal called out for Nasreen Damrah, who then emerged from the basement, where she had remained since an agent confined her there. Nasreen Damrah had been crying and the agents observed it. At this time, agents already had

---

1. Agent Oliver states:

A. When I arrived there, I knocked on the door. At that time there were other agents inside the house escorting Mr. Damrah out the back door because the media was out the front door. So walked in the house, and as we were going in the other people were already leaving.

. . . . .

Q. And at the time you entered the house where was Fawaz Damrah?

A. I believe he was already outside, out the back door.

Agent Garewal states:

Q. Did you enter the Damrah residence that morning?

A. Yes I did.

Q. And approximately when was that, if you recall?

A. I know it was actually when they were getting ready to bring Mr. Damrah out the back door. I don't know the exact time.

Q. When you entered was he still present in the home?

A. Yes. I think I said he was getting ready to leave the residence.

removed Fawaz Damrah. Although the purpose and justification for the officers' presence in the Damrah house was to arrest Damrah, the two female agents remained in the home following the arrest. The agents offered Nasreen Damrah a tissue and something to drink and engaged her in conversation. However, the dialogue was admittedly a ploy to solicit trust from Nasreen Damrah. Oliver testified that she engaged in conversation with Damrah "[m]ainly to offer the tea and the water and let her wipe her tears, make her a little bit more comfortable, to let her know who we were and what we were doing there." (Tr. 25).

After directing Nasreen Damrah to come up from the basement Agent Garewal engaged her in conversation. Nasreen Damrah testified that the conversation began after she came to the family room and the agents offering her tea and speaking with her about her children. She says they then sought permission to search the house. When Nasreen Damrah asked what reason they sought to search the house, she testified: "When the agent told me [s]he wanted to search the house, I said for what. She told me for weapons. I told her we don't have any weapons. She told me she wanted to make sure." (Tr. 59). Agent Garewal acknowledges saying this to Nasreen Damrah. (Tr. 25–26).

Garewal's professed concern for weapons conflicts with testimony before the Court. Nasreen Damrah testified, without contradiction, that the arresting officers had permitted her husband, the defendant in this case, to go unaccompanied to his bedroom to secure clothes before being taken for booking.[2] Garewal's professed

concern for officer safety is thus difficult to understand. First, no law enforcement agents had reason for remaining on the premises even if there was reason to believe weapons had been present. Second, only Nasreen Damrah and her eight-year-old daughter were present in the house. So only Nasreen Damrah, who has no known criminal record, and the eight-year-old child could offer a threat. Third, the agents had allowed Fawaz Damrah to go to his bedroom without an escort-hardly an appropriate step if weapons were a concern. Most important, Agents Garewal and Oliver came to the house only as Fawaz Damrah was being removed, a time that any threat had dissipated. And repeating, Agents Oliver and Garewal had no reason or justification to be at the house after the arresting agents removed Defendant Fawaz Damrah.

Although acknowledging a desire to search for weapons, Agents Oliver and Garewal say the conversation began with the agents explaining to Nasreen Damrah that her husband would appear in court later that day; the agents drew a map and gave Nasreen Damrah directions to the federal courthouse. At some point in the conversation, Nasreen Damrah offered: "We're good people. We have nothing to hide." (Tr. 71). Agent Garewal asked if she could look around. (Tr. 38). Nasreen Damrah indicated that she had no objection and Special Agent Oliver presented her with consent forms in English and Arabic. Although she had been born in Palestine and Arabic was her first language, Nasreen Damrah declined to review the form in Arabic. Instead, she quickly read the form in English, and signed it. Although the preface to obtain-

---

**2.** Nasreen Damrah testified:

    Q. What was the next thing that happened?

    A. The agent told my husband to go upstairs and change. And when he came

down the agent told him to hand him his passport. And then they took him and they left.

Tr. 58.

ing the consent involved Agent Garewal's representation that the agents were looking for weapons, the form Nasreen Damrah signed authorized the agents "to take any items which they determine may be related to their investigation."

Although extremely emotional because of the arrest of her husband in their home, Nasreen Damrah was lucid and composed at the time she executed the consent. In its entirety, the consent form provides:

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of (Describe the person(s), place(s), or thing(s) to be searched.):

   *my residence—10102 Lake Meadows Drive Strongsville, Ohio*

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related to their investigation.

   1/13/04     /s/Nasreen Damrah
   Date        Signature

The italicized portion of this form was not in typeface. Instead, one of the agents wrote it by hand onto the form.

Thereafter, four additional agents, who had been waiting outside, entered the home and conducted a search. The search took approximately one hour. During the search, Nasreen Damrah asked and re-

ceived permission to call a friend, Obay Altaher. Altaher arrived "at that point in time the search was pretty much over." (Tr. 16–17).

Upon completing the search, the agents presented Nasreen Damrah with an inventory reflecting the seizure of various items of property. Among the items seized was a computer, a computer CD, a passport, and miscellaneous documents. The agents also removed thirteen video tapes from the home, but neglected to mention this on the form. The government later corrected this mistake.

On March 2, 2004, Defendant Damrah moved to suppress all items seized from his home, alleging that the agents remained in his home unlawfully and that Nasreen Damrah's consent was not voluntary in light of all the facts and circumstances [Doc. No. 29]. The Court heard oral argument on this motion on April 14, 2004. On May 11, 2004, the Government disclaimed any intent to use the seized materials in its case-in-chief [Doc. No. 85]. On May 13, 2004, the Court thus held Damrah's motion to suppress in abeyance [Doc. No. 88]. On June 3, 2004, the government recanted and notified the Court of its intent to offer a copy of the Palestinian Islamic Jihad ("PIJ") manifesto, found in Damrah's home in the January 13, 2004 search, in its case-in-chief against Damrah [Doc. No. 115].[3] The Court therefore decides Damrah's motion to suppress.

---

**3.** The government says it intends to use the PIJ manifesto to show the strength of Damrah's ties to PIJ. According to the government, only a high-ranking official would have a copy of this document. The Court expresses some confusion regarding how the government intends to substantiate this argument. Damrah is a former professor at several Cleveland-area colleges and may have possessed the copy merely for educational purposes.

    The Court's bigger concern, however, is that the government has provided no insight as to how it plans to establish that Damrah

possessed the manifesto prior to receiving citizenship in 1994. Recall that Damrah is charged with unlawful procurement of citizenship and that one of the factual underpinnings of this charge is the allegation that Damrah failed to disclose his affiliation with PIJ on his immigration paperwork. Even if the Court indulges the government's assumption that only a high-ranking PIJ official would have a copy of the manifesto, the government would *still* need to show that Damrah possessed the manifesto prior to obtaining citizenship in April 1994 for the document to be at all relevant. To this point, the govern-

## II. LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." The Fourth Amendment's prohibition against unreasonable searches and seizures forbids most warrantless searches. *See Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (stating that warrantless searches are "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions"). Searches to which the defendant consents are among the exceptions to this rule. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973).

■ In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the United States Supreme Court held that the authority to consent is not limited to defendants themselves. Instead, third parties may consent to a search if they have "common authority over or other sufficient relationship to the premises ... to be inspected." *Matlock,* 415 U.S. at 171, 94 S.Ct. at 993. Elaborating on this standard, the *Matlock* Court stated that "common authority ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at n. 7, 94 S.Ct. 988. However, a third party need not actually have common authority over the property for the search to be constitutionally permissible. Instead, courts will uphold a search if "the facts available to the

officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (quoting *Terry v. Ohio,* 392, U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)).

Regardless, an otherwise valid consent may not be sufficient to render a search constitutional if it follows from prior government misconduct. In such circumstances, the unlawful conduct "taints" the later-given consent. *United States v. Lopez–Arias,* 344 F.3d 623, 629 (6th Cir.2003) (unlawful seizure taints later consent); *United States v. Buchanan,* 904 F.2d 349, 355 (6th Cir.1990) (unlawful presence on property taints later consent).

## III. ANALYSIS

The underlying issue in this case is whether Agents Garewal and Oliver were lawfully on the premises of the Damrah home at the time they received Nasreen Damrah's consent to search. If they were not, then their unlawful presence taints her consent, unless it was sufficiently attenuated from their unlawful presence.

### A.

In *Steagald v. United States,* the Supreme Court noted that "[t]he purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search." 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). The *Steagald* Court distinguished the purpose of arrest warrants from the purpose underlying search warrants: "An arrest warrant ... serves to protect an individual from an unreasonable seizure. A search

ment has pointed to nothing indicating that Damrah had the manuscript before April 1994. For this reason, the manifesto is likely

not admissible for reasons wholly separate from the Court's decision on the instant motion to suppress.

warrant, in contrast ... safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Id.* Therefore, the Court noted that "whether [an] arrest warrant ... adequately safeguard[s] the interests protected by the Fourth Amendment depends on what the warrant authorize[s] the agents to do." *Id.*

■ In this case, the government possessed an arrest warrant, but no search warrant. The arrest warrant, on its own, operated to protect Fawaz Damrah from an unreasonable seizure. However, it did nothing to protect his interest—or Nasreen Damrah's interest—in the privacy of their home and possessions against unjustified intrusion. Put differently, the arrest warrant justified an intrusion into the Damrahs' house, but only for the limited purpose of arresting Fawaz Damrah.

Defendant argues that Agents Garewal and Oliver were not lawfully on the premises when they obtained consent to search from Nasreen Damrah. The Court agrees. According to the agents' testimony at the suppression hearing, they entered the front of the house either just before or just after other agents escorted Fawaz Damrah out the back door of his home. Either way, other agents had already effectuated the arrest by the time Agents Garewal and Oliver entered. As previously discussed, the government had an arrest warrant for Fawaz Damrah, but no search warrant for his home. Under the terms of the warrant, once the agents effectuated the arrest and removed Fawaz Damrah from his home, their job was finished. Beyond that, agents had no right to enter or to remain on the property.

The government's brief glosses over this fact. To the government, the fact that some agents possessed an arrest warrant for Fawaz Damrah permitted other agents to enter the Damrahs' home and to loiter

after the arrest had taken place. The Court can find no case justifying such conduct. The only doctrine explicitly permitting government agents to remain on the property following an arrest is that enunciated in *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). There, the Supreme Court examined whether law enforcement officers could conduct a protective sweep of areas near a defendant subject to arrest. In recognizing, but also cabining, the ability of officers to conduct such a protective search, the Court held that such a sweep must "last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093. Thus, the only doctrine permitting government agents to linger following the execution of an arrest warrant expressly limits both the purpose of such lingering (to ensure the officers' safety) and the permissible time of such lingering ("no longer than it takes to complete the arrest and depart the premises"). The agents' presence in this case clearly surpasses these limits.

The Court notes that an arrest warrant does not open the gate to a defendant's castle indefinitely. If the officers had barged into Damrah's home two days after arresting him, they would be unable to justify their presence with the earlier-executed arrest warrant. Just the same if they entered Damrah's home two hours after the arrest. The Court can see no reason to reach a different conclusion where the gap in time is shorter, but still present. Because the search was not part of the same transaction as the arrest (as is explained in the following paragraph), the agents' presence in Damrah's home at the time Nasreen Damrah consented to the search was improper.

The government also argues that procuring Nasreen Damrah's consent to search was merely an incident of the search—something that just happened to occur while the agents executed the arrest warrant. However, the record reflects that arresting Fawaz Damrah and procuring consent to search the home from his wife were two separate transactions. Different agents were assigned to the two different tasks. Also, the different teams arrived at different times. Indeed, the agents separated Nasreen Damrah from the two different teams of agents spatially and temporally by shutting her in her basement during the time that one team exited and the other entered. None of this occurred by accident; indeed, the agents' testimony reveals that it was all—from the timing of the entries to the gender of the officers sent to procure consent—by design. These facts prevent the government from arguing effectively that procuring Nasreen Damrah's consent to search the home was merely an incident of executing the arrest warrant. And because procuring consent was a separate transaction, the agents lacked independent authority to remain on the premises to do so.

This inquiry is a fact-intensive one and does not foreclose the possibility of lawful searches that follow a validly executed arrest warrant. For instance, if the agents had not kept Nasreen Damrah in the basement until after the time agents removed her husband from the home and *then* rang the doorbell and asked permission to enter, their presence likely would not be unlawful. But here, Nasreen Damrah was shut in the basement, and thus unable to determine whether Agents Garewal and Oliver had lawfully entered the home with the arresting officers, or had unlawfully entered the house after the arrest was effectuated with a purpose entirely separate from executing the arrest warrant. This fact renders meaningless the government's argument that Nasreen Damrah

did not ask the agents to leave. The agents' plan all along was apparently to prevent Nasreen Damrah from knowing whether she had the right to ask them to leave. The agents entered the Damrahs' uninvited and without any authority derived from a warrant. Their presence was thus unlawful.

For the above reasons, the Court finds that under the facts of this case, the agents' uninvited lingering on the premises for purposes of procuring consent to search is unreasonable and thus in violation of the Fourth Amendment.

### B.

■ As previously indicated, where consent follows a prior unlawful act by the government, that consent is tainted, and cannot on its own justify a search. The Government must show more than mere voluntariness. *See Brown v. Illinois,* 422 U.S. 590, 601–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ("[E]ven if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment ... requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'") (quoting *Wong Sun v. U.S.,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). To overcome this taint, the government must prove an "intervening act of significance between the time of the illegal [presence] and the time" the consent form is signed. *United States v. Buchanan,* 904 F.2d 349, 356 (6th Cir. 1990).

The Sixth Circuit has examined this issue in several cases similar to this one. In *United States v. Buchanan,* the Sixth Circuit found that exigent circumstances had not justified police officers' warrantless entry into a house. 904 F.2d 349, 355 (6th Cir.1990). After finding that the police

officers were improperly within the residence, the court examined whether a subsequently obtained consent vitiated the improper entry. Writing for the court, Judge Milburn described the appropriate standard:

The consequence of "an illegal entry is to make unlawful any ensuing interrogations or searches . . . ." *United States v. Vasquez*, 638 F.2d 507, 527, *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). "[S]uppression is required of any items seized during the search of the house, unless the taint of the initial entry has been dissipated before the 'consents' to search were given." *Id.* Dissipation of the taint resulting from an illegal entry "ordinarily involves showing that there was some significant intervening time, space, or event." *Id.* at 528.

*Id.* at 356.

■ Alternatively phrased, the consent must be "sufficiently attenuated" from the illegal act by the government. *United States v. Lopez–Arias*, 344 F.3d 623, 630 (6th Cir.2003). In determining whether a consent was sufficiently attenuated from an unlawful seizure, the Sixth Circuit recently applied four factors:

(1) the length of time between the illegal seizure and the consent;

(2) the presence of intervening circumstances;

(3) the purpose and flagrancy of the official misconduct; and

(4) whether the officers read the suspect his *Miranda* rights before he consented.

*Id.* (citing *Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 1847, 155 L.Ed.2d 814 (2003)). Further, the Court noted that the government carries the burden of persuasion.

■ Applying those factors here, the Court concludes that Nasreen Damrah's consent was not sufficiently attenuated from the agents' unlawful presence in her home. The agents' unlawful presence had lasted less than ten minutes before Nasreen Damrah gave her consent to search the home. Such a short period is insufficient to end the influence of the Agents' improper entry and remaining at the Damrah residence after the justification for their entry ended with the removal of Fawaz Damrah. *See, e.g., Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (a separation of less than two hours between an illegal arrest and a voluntary statement was insufficient to break the causal chain between the two.). Sixth Circuit case law bolsters this conclusion. *See United States v. Richardson*, 949 F.2d 851, 859 (6th Cir.1991) ("We do not believe that the taint had dissipated after merely twenty (20) minutes of continued improper conduct."); *Buchanan*, 904 F.2d at 356 (holding an hour to be insufficient). Indeed, the unlawful activity tainting the consent (the agents' remaining in the Damrahs' home) continued up through, and beyond the consent. Thus, the first factor weighs in Damrah's favor.

The second and third factors also weigh in Damrah's favor. The government has not pointed to any intervening circumstance that broke the causal chain connecting the agents' unlawful presence in her home to the consent to search. In *Buchanan*, the Sixth Circuit identified the opportunity to consult with an attorney as such an intervening circumstance. *Buchanan*, 904 F.2d at 356 (citing *United States v. Wellins*, 654 F.2d 550, 555 (9th Cir.1981)). Again, the record in this case contains no evidence of any comparable intervening circumstance, so the second factor weighs in Damrah's favor. The third factor also weighs in Damrah's favor because the aforementioned design of the agents' plan to obtain consent necessarily depended upon their lingering past their authorized presence. Although the misconduct in this case was more subtle than flagrant, it was still calculated, which indi-

cates that the government acted with purpose in establishing an unlawful presence in the Damrahs' house.

The fourth factor in this case is a non-issue. Because this case features an unlawful presence in the home, as opposed to an unlawful seizure or arrest, applying the *Miranda* factor would make little sense.

In its brief, the government relies on the Tenth Circuit case of *United States v. Mendoza–Salgado*, 964 F.2d 993 (10th Cir. 1992). The *Mendoza* court found that the defendant's wife's unsolicited consent justified a government search of the defendant's home, the officers' unlawful entry notwithstanding. Because the court found that intervening circumstances rendered the consent an act of free will, it affirmed the district court's decision to deny the defendant's motion to suppress evidence. *Id.* at 1012–13.

*Mendoza*, however, is not controlling; it is a Tenth Circuit case and no Sixth Circuit case has adopted the *Mendoza* court's analysis. Even if it were binding precedent, this case is readily distinguishable from *Mendoza* in at least four ways. First, the instant case contains evidence that the agents potentially misled Nasreen Damrah regarding the purpose of the search (to look for weapons). The facts of *Mendoza* feature no such ruse. Second, the cases are distinguishable along temporal grounds. In *Mendoza*, the court found that the thirty to forty-five intervening minutes between the unlawful entry and the consent was a long enough period of time to qualify as an intervening circumstance. Here, less than ten minutes transpired between the unlawful entry and the consent, and the government points to no case in which ten minutes was sufficient to be an intervening circumstance. Third, *Mendoza* differs from this case in that *Mendoza* contained no evidence of a previously concocted plan to procure consent. Quite the contrary, in *Mendoza*, "the idea

of obtaining consent had been 'abandoned, for all intents and purposes' after [the defendant] denied officers permission to search." *Id.* at 1012. Finally, and most crucially, the district court in *Mendoza* had rejected the defendant's wife's testimony as not credible. *Id.* at 1013. Here, the Court has made no such determination; to the contrary, it finds Nasreen Damrah's testimony credible.

In this case, the government has the burden of showing that the causal chain between the prior violation and the consent has been broken. Here, it has not met this burden. The government has not demonstrated that any intervening circumstances purged the taint of the agents' unlawful presence in the Damrahs' home. Nor has the government introduced any evidence that Nasreen Damrah would have allowed the officers to enter and search if they had rang the doorbell and requested such permission. Thus, the government has not met its burden.

## IV. CONCLUSION

For the aforementioned reasons, the Court concludes that the government failed to establish that any intervening act of significance cleaned the taint of the government's prior misconduct upon Nasreen Damrah's consent. For this reason, the court GRANTS Defendant Damrah's motion to suppress evidence seized from his home.

IT IS SO ORDERED.