UNITED STATES of America,
Plaintiff,

v.

Daniel GAMEZ, Defendant.

No. 2:05–CR–90.

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 5, 2005.

Dale Edward Williams, Jr., United States Attorney, Columbus, OH, for Plaintiff.

Alison M. Clark, Federal Public Defender, Columbus, OH, for Defendant.

### OPINION AND ORDER GRANTING MOTION TO SUPPRESS

MARBLEY, District Judge.

## I. INTRODUCTION

This matter comes before the Court on Defendant, Daniel Gamez's, Motion to Suppress Physical Evidence and Statements Taken After Warrantless Search of 5574 Earhart Avenue, Columbus, Ohio. Defendant claims the agents obtained his consent to enter his apartment through coercion. Defendant also argues that neither his consent to search nor his subsequent confession were sufficiently attenuated from the illegal entry and thus, all evidence found and statements made subsequent to his consent must be suppressed. For the following reasons, the Court finds Defendant's arguments well-taken and **GRANTS** Defendant's Motion to Suppress.

## II. FACTS

On March 3, 2005, the Columbus Police Department alerted the United States Secret Service that four individuals had been detained at a Kohl's department store at approximately 3:30 p.m. for suspected use of counterfeit money. The individuals were interrogated by various Secret Service agents ("agents") until approximately 6:00 p.m. At this time, the agents transferred one of the men, Robert Martinez, to another location for continued interrogation. At some point between 6:00 p.m. and 7:30 p.m., Mr. Martinez divulged that he received the counterfeit money from a man named "Lupe," who was later identified as Defendant Daniel Gamez. Between 7:00 p.m. and 7:30 p.m., the agents contacted Assistant United States Attorney ("AUSA") Williams to determine whether a warrant could be procured to search Defendant's apartment. After conferring with AUSA Williams, the agents decided that obtaining a warrant would not be practical because of the late hour and because Mr. Martinez, while he knew how to locate Defendant's apartment, did not know the exact address. Additionally, the agents feared that one of the other three suspects detained at Kohl's, who would all soon be released from questioning, might somehow alert Defendant to the FBI's interest, prompting Defendant to destroy any incriminating evidence and flee. Thus, upon recommendation of AUSA Williams, the agents decided to ask Defendant for his consent to search his apartment.

Sometime between 9:00 p.m. and 10:00 p.m., six agents escorted Mr. Martinez to Defendant's apartment, located on the second story of a two-story apartment complex that had only outside hallways. Although it was dark at the time, the area in front of Defendant's apartment was artificially lit by a few small lights. The agents were dressed in plain-clothes and were carrying their standard issue sidearm pistols.

The agents asked Mr. Martinez to knock on Defendant's door and then positioned

themselves alongside of Mr. Martinez, away from the door. This was done both to keep Defendant from seeing the agents when he initially checked to see who was at the door and to protect the agents if Defendant reacted violently upon answering the door. Mr. Martinez knocked on the door. Defendant cracked open the door, but kept the door chain in place. Upon seeing Mr. Martinez, he opened the door completely. Mr. Martinez then stepped aside and one of the agents, Agent Salem, took Mr. Martinez's place right in front of the door. Defendant, through an interpreter, testified that upon opening the door, he saw Agent Salem, who did not have his gun visible, and two other agents, one of whom held his gun in a general downward direction and the other who pointed his gun toward the sky.[1] Agent Salem, in English, identified himself to Defendant, stated that law enforcement suspected use of counterfeit money, and asked if he could enter the apartment. At this point, Defendant moved backward. The agents testified that they construed his backward movement as an indication of Defendant's consent to their entry. There is some dispute as to whether Defendant responded. Agent Barrick testified that Defendant said "yes" when asked if the agents could enter. Agent McClellan, who was standing a bit farther away from the door, did not hear Defendant speak. Defendant denies speaking.

After Defendant stepped aside from the door, the agents entered the apartment and, to ensure their safety, conducted a protective sweep of each room in the apartment: a living room, an attached kitchen, a bathroom, and a single bedroom.

In the bedroom, the agents found a sleeping woman, who was later identified as Katelyn Bryant, Defendant's girlfriend. On the floor of the bedroom, in plain view, the agents saw a printer with a sheet of printed counterfeit Mexican money nearby.

At that point, the agents brought Ms. Bryant and Defendant into the living room and asked them to sign a form giving the agents permission to search the premises. Ms. Bryant attempted to translate the form to Defendant by using simpler English words, and the agents attempted to ensure Defendant's comprehension of the form by referencing various law enforcement-based television shows. Ms. Bryant then asked the agents whether they would obtain a search warrant in the event she refused consent, to which the agents responded that they had already seen the printer in plain view. At that point, both Defendant and Ms. Bryant signed the form.

About an hour after the officers entered, Defendant and Ms. Bryant were taken to the Columbus Police Department and interrogated. At 11:15 p.m., Defendant gave the agents a written confession, in Spanish, admitting to his counterfeiting activity. Ms. Bryant returned to her apartment at 3:00 a.m. and found two agents still present. They had seized an HP Office Jet 5510 printer/copier/fax, counterfeit United States and Mexican currency, and Defendant's wallet, in which the agents found $160.00 of counterfeit currency. On March 31, 2005, Defendant was indicted and charged with ten counts of counterfeiting in violation of 18 U.S.C. §§ 471, 478.

---

1. Defendant is a Mexican immigrant whose native language is Spanish. With regard to Defendant's ability to understand English, the Court finds that Defendant has developed some knowledge of English because he has lived with an American woman for one year and has been involved with her, romantically or otherwise, for a total of at least three years; however, Defendant relies heavily on various gestures and simplified words to communicate effectively. Defendant would be unable to fully comprehend and/or waive his constitutional rights if explained or stated in English.

Defendant filed this Motion on May 3, 2005 asking the Court to suppress all evidence and statements, written or otherwise, arising out of the allegedly illegal entry into Defendant's apartment. The Court held an evidentiary hearing on June 6, 2005 at which Agents Barrick and McClellan testified. Defendant also provided limited testimony on his own behalf. This matter is now ripe for disposition.

## III.  ANALYSIS

### A.  Consent to Enter

■■■ The Fourth Amendment to the Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. CONST. IV. As a general rule, a person may waive his Fourth Amendment rights by consenting to a search. *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). Consent to a search "may be in the form of words, gesture, or conduct." *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir.1976). A search based on consent, however, "requires more than the mere expression of approval to the search. As a waiver of the rights provided in the Fourth Amendment, a valid consent must be free and voluntary." *United States v. Jones*, 641 F.2d 425, 429 (6th Cir.1981) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The government bears the burden of proving "through clear and positive testimony," by a preponderance of the evidence, that valid consent was obtained prior to the search. *United States v. Lewis*, No. 03–6102, 110 Fed.Appx. 569, 571 (6th Cir.2004) (citing *United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir.1996)).

■■■ Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is "a

question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Factors to be examined when determining the validity of consent include (1) the age, intelligence, and education of the individual, (2) whether the individual understands his constitutional rights and that he has the right to refuse consent, (3) the length of time the individual is detained before consenting to a search and the nature of the detention, and (4) any police use of "coercive or punishing conduct" to obtain the consent. *Riascos–Suarez*, 73 F.3d at 625 (citation omitted). Upon consideration of the totality of the circumstances, this Court finds that the government failed to meet its burden of showing that Defendant's consent was voluntary.

At trial, Defendant credibly testified that he was in his bedroom when he heard three or four knocks on the front door. He did not hear anyone call out, but when he unlocked the security chain, he saw his acquaintance, Mr. Martinez, through the cracked door. When he opened the door completely, Defendant saw two or three officers and two weapons. Believing he could not refuse entry, he backed away from the threshold.

In *United States v. Carter*, 378 F.3d 584 (6th Cir.2004) (en banc), the Sixth Circuit passed upon a somewhat similar fact pattern. There, the police suspected a defendant of using drugs in a hotel room. *Id.* at 587. Three police, dressed in various forms of police garb, knocked on the hotel room door four times. *Id.* When the defendant opened the door, they identified themselves, smelled marijuana, and asked if they could enter. In response, "Carter stepped back and cleared a path for the officers to enter." *Id.* The *Carter* court explained that the defendant's consent was voluntary in nature because, in part, "any

ordinary caller, under like circumstances, would understand assent to have been given, and the police are not held to a higher standard in this regard than an ordinary person." *Id.* at 587 (citation omitted).

In analogizing the officers to ordinary callers, the court emphasized that "[n]one of the officers had their firearms drawn or otherwise behaved in a threatening manner." *Id.* Indeed, the court repeatedly stressed the fact that "Carter was not threatened, coerced, or tricked when he chose to let the officers into his room." *Id.* at 588. Throughout its ruling, the court highlighted the absence of drawn guns and the fact that "the investigating officers were instantly recognizable as policemen when Carter opened the door." *Id.* at 588. Moreover, the court found persuasive that "nothing in the record indicates that [Carter] was unaware of his well-known right to refuse entry, which he might have done simply by standing pat, saying "no," or closing the door." *Id.* at 588.

Turning to the facts before this Court, the officers here engaged in a drastically different approach, rendering the facts of *Carter* inapplicable. First, when Defendant opened the door, he was unaware that law enforcement officers were on the other side; rather, he expected to see Mr. Martinez, whom the agents had engaged to entice Defendant to open the door. While this ruse in and of itself is not dispositive, it is a factor the Court must consider in determining voluntariness. Second, not only was Defendant surprised by the officers' presence, but the officers greeted him with at least two guns drawn in what the Court finds was an overtly menacing manner. Each officer gripped his gun with both hands and had his arms outstretched in a manner consistent with readying a pistol for use. Although, as the government asserts, a drawn gun *can* be a characterized as a reasonable precaution,

*see, e.g., United States v. Scott,* 578 F.2d 1186, 1189 (6th Cir.1978) (finding consent voluntary even though "one officer may have had a gun drawn" because the police did not suspect the consent-giver of criminal activity at that point and because the consent-giver was free to leave the apartment upon police entry), the Court finds that the officers' drawn guns, in the ready position, although not pointed at Defendant, were not used in a precautionary manner. As the agents testified, they strongly suspected Defendant of counterfeiting, they believed that evidence of such would be in his apartment, and they approached his door intending to detain him upon entry. Indeed, had they wanted to obtain a warrant, they likely would have had the probable cause necessary to do so. Third, unlike the defendant in *Carter,* Defendant explicitly stated during the evidentiary hearing that he did not know that he had the right to refuse entry.

In short, because of the agents' ruse, the presence of multiple guns, and Defendant's testimony that he did not know refusing entry was a viable option, the totality of the circumstances here requires this Court to find Defendant's consent was not voluntary; rather, Defendant was responding to the agents' use of coercion to obtain entry. His backward movement away from the door represented a "submission to authority rather than as an understanding and intentional waiver of a constitutional right." *United States v. Jones,* 641 F.2d 425 (6th Cir.1981) (citing *Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). The officers at Mr. Gamez's door simply cannot be viewed as "ordinary callers." *Carter,* 378 F.3d at 587. Although the language barrier between the agents and Mr. Gamez may have played some role in the illegal entry, the Court doubts that any person, fluent in English or not, would feel at liberty to close the door if three officers, two with

guns drawn, knocked on the front door at 10:00 p.m. The Court will not demand such fortitude from Defendant.

## B. Exigent Circumstances

In the alternative, the prosecution argues that exigent circumstances justified a warrantless search because had the agents waited to obtain a warrant, the other three individuals arrested at Kohl's, who were to be released after questioning, would have alerted Mr. Gamez to the investigation, prompting him to dispose of any evidence and flee.

■■■■ A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 996 (6th Cir.1994). Warrantless entry is permissible, however, if exigent circumstances exist. *Hancock v. Dodson,* 958 F.2d 1367, 1375 (6th Cir. 1992). Exigent circumstances exist where there are "real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick,* 287 F.3d 492, 501 (6th Cir.2002) (citing *O'Brien,* 23 F.3d at 997). The imminent destruction of evidence may give rise to exigent circumstances. *United States v. Williams,* 354 F.3d 497, 503 (6th Cir.2003) (citing *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994)).

■■■■ The Court is not persuaded by the prosecution's argument that destruction of evidence was imminent. First, Agent McClellan testified that law enforcement had no information that evidence would be destroyed or that Defendant planned to flee. Second, the government presented no evidence that any one of the other three people detained at Kohl's would contact Defendant or knew Defendant's contact information. Third, the Court finds the timeline of events does not support the prosecution's claim that exigent circumstances existed. The agents learned about

Defendant's counterfeiting activity at some point between 7:00 p.m. and 7:30 p.m. Agent Barrick testified that the FBI could not wait the two hours needed to obtain a warrant because Defendant would learn about the Kohl's arrest and flee or destroy the evidence. The agents, however, did not enter Defendant's apartment until sometime after 9:30 p.m., likely closer to 10:00 p.m. The fact that the agents waited almost three hours to approach Defendant belies their claim that exigent circumstances justified a warrantless entry. Indeed, had the agents taken the time to obtain a warrant, the search warrant would likely have been ready by approximately 9:00 p.m. and the agents would have entered Defendant's apartment *with* a warrant at approximately the same time as they entered *without* one.

## C. Consent to Search Form and Written Confession

In light of the illegal entry into Defendant's apartment, the Court must now determine whether the taint of the illegal entry had dissipated by the time Defendant and Katelyn Bryant signed the consent to search form, which occurred approximately three minutes after the agents' entry.

■■■■ When consent is given after an illegal entry has occurred, the consent is invalid and all items seized during the search are suppressed "unless the taint of the initial entry has been dissipated before the 'consents' to search were given." *United States v. Buchanan,* 904 F.2d 349, 356 (6th Cir.1990) (quoting *United States v. Vasquez,* 638 F.2d 507, 527 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981)). A taint has been effectively dissipated if there is some showing of "some significant intervening time, space, or event." *Id.* (quoting *Vasquez,* 638 F.2d at 528). The government

has the burden of showing by a preponderance of the evidence that the defendant's consent "was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion." *Buchanan*, 904 F.2d at 356.

■ This Court finds that the taint of the illegal entry was not sufficiently dissipated at the time Defendant and Ms. Bryant signed the consent form. In *United States v. Chambers*, 395 F.3d 563, 569–70 (6th Cir.2005), the officers entered illegally and detained the defendant while conducting a brief preliminary search of the premises. During this search, the police found evidence of a methamphetamine lab in plain view and *then* asked the defendant to sign the consent to search form, which the defendant did, testifying that she did not realize she had another viable option. The court found that the taint of the illegal entry had not dissipated, stating, "[i]t would be reasonable for Chambers to think that refusing consent would be a futile gesture amounting to no more than 'closing the barn door after the horse is out.'" *Id.* at 571 (citing *United States v. Chambers*, No. 02–20423, 2003 WL 1906170 (W.D.Tenn. Mar.24, 2003)); *see also United States v. Damrah*, 322 F.Supp.2d 892, 900 ("The agents' unlawful presence had lasted less than ten minutes before Nasreen Damrah gave her consent to search the home. Such a short period is insufficient to end the influence of the Agents' improper entry. . . .").

The Court finds that the approximately three minutes between the illegal entry and the signing of the consent form did not sufficiently dissipate the taint of the unlawful entry. As Agent Barrick testified, Ms. Bryant and Defendant knew that the officers had seen the printer Indeed, Ms. Bryant asked if the officers would simply obtain a search warrant if the consent form was not signed. As in *Chambers*, Defendant would have been reasonable in his belief that refusing to sign would be a futile gesture. Moreover, Ms. Bryant and Defendant were, at that time, in a custodial environment and likely felt substantial pressure to cooperate. As Agent Barrick testified, Defendant was not free to leave his apartment after the agents entered. In short, the taint of the illegal entry was not dissipated. Thus, all evidence gathered and statements made in relation to the apartment search are hereby suppressed.

■ This analysis extends to the confession signed by Defendant at the police station at 11:15 p.m. that night. The Court finds that the taint of the illegal entry had not yet dissipated because in a one hour and approximately thirty minute time span, the agents illegally entered the apartment, frisked Defendant, performed a protective sweep, detained Defendant and Ms. Bryant, transported them to the police station, and obtained a signed confession from Defendant. The government proffered no evidence of any intervening circumstance that would have broken the causal chain between the entry and confession. *Id.* at 603 (finding a separation of less than two hours between an illegal arrest and a voluntary statement was insufficient to break the causal chain between the two); *United States v. Richardson*, 949 F.2d 851, 859 (6th Cir.1991) ("We do not believe that the taint had dissipated after merely twenty (20) minutes of continued improper conduct."); *Buchanan*, 904 F.2d at 356 (holding an hour to be insufficient). Moreover, Defendant's receipt of his Miranda warnings is not dispositive. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ("[T]he *Miranda* warnings, alone and per se, cannot always ... break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."). The Court suppresses the signed confession.

## IV. CONCLUSION

Defendant's Motion to Suppress is **GRANTED** in full.

**IT IS SO ORDERED.**